Warren DILLON and Jean Dillon, Individually and on behalf of others similarly situated, Plaintiffs,

v.

AFBIC DEVELOPMENT CORP. et al., Defendants.

Civ. A. No. 7693–73–H.

United States District Court,
S. D. Alabama, S. D.

July 30, 1976.

J. U. Blacksher, Mobile, Ala., for plaintiffs.

Richard W. Vollmer, Jr., Mobile, Ala., for defendant Bay City Const. Co.

Chase R. Laurendine, Mobile, Ala., for defendants Riley Smith, Inc., Riley B. Smith and AFBIC Development Corp.

## FINDINGS OF FACT—CONCLUSIONS OF LAW

HAND, District Judge.

This cause having been reinstated on the active docket of this Court pursuant to the Mandate of the Fifth Circuit Court of Appeals, and discovery having gone forward in the full sense of the word, and this matter set for trial, and trial having been had, this Court is now called upon to determine the existence, vel non, of racially discriminatory acts or conduct perpetrated upon the plaintiffs by the defendants named herein. Further, this Court is called upon to determine whether there existed a pattern or practice of racial discrimination, or a pattern or practice which had a racially discriminatory impact upon a class of prospective black home purchasers defined as follows:

"All black persons who are now seeking, or who in the future may seek, to purchase or rent dwellings from or through the services of defendants, AFBIC Development Company, Riley Smith, Inc., and Riley B. Smith."

Regarding the issue of the existence or perpetration of discriminatory acts or conduct by the defendants, the Court must, of course, look to the case presented by the plaintiffs to establish a prima facie case of racial discrimination before the provisions of the Fair Housing Act, Title 42, U.S.C.A., § 3601 et seq., are triggered. It is to be further noted that the plaintiffs herein, Warren and Jean Marie Dillon, were not together at the times the alleged racially discriminatory conduct transpired, since plaintiff Warren Dillion was attending an IBM class in the City of Chicago, Illinois during this period. The Court is left then to determine the existence of such conduct based solely on the testimony of the experiences of plaintiff, Jean Marie Dillon.

Mrs. Dillon testified that in April, 1973, she noticed an ad in the Mobile Press Register, in a section known as the "Parade of Homes", which caused her curiosity to mount and which resulted in a visit by her to a subdivision known as "Lansdowne". She drove through the subdivision on numerous occasions which stimulated her interest in several of the homes available resulting in a visit to the offices of Riley Smith, Inc. where she met Mr. Guillot. She informed Mr. Guillot that, although she was interested in a specific house she could not make up her mind whether she wanted to purchase the house immediately or since her husband was out of town, wait for his return to make her "final decision". Mr. Guillot invited Mrs. Dillon to continue her inspection of the homes and to inform him if a decision had been reached so that the purchasing process could be commenced. Mrs. Dillon testified:

"I told him (Guillot) I had an interest in that particular house because my husband had already seen that house, and there was two more houses that I did like,

but I didn't like the master bedroom off from the den, and I told him that I would get in touch with him later as soon as I made my decision about the house."

Mrs. Dillon stated that Guillot cautioned her that the house located at 5229 Drexel Drive was presently on the market and if she waited until her husband returned to Mobile the house may very well be sold and he *urged* her to sign a contract for the purchase of said home.

In an attempt to resolve her dilemma, Mrs. Dillon returned to the subdivision on Mother's Day accompanied by Mrs. Bernice Mosley. While in the Lansdowne Subdivision on this occasion, Mrs. Dillon testified that she again met Mr. Guillot who urged "writing up the house for me", to which she responded that she "would contact him again". There is no doubt, at least at this juncture, that Mrs. Dillon was reflecting upon at least three homes. There were also other indecisive factors at work at this time since, in Mrs. Dillon's words, "my husband was still out of town and I did want to talk to my husband before I made the final decision for purchasing".

Mrs. Dillon returned to the Lansdowne Subdivision the day next following her visit with Bernice Mosley; Mrs. Dillon testified that it was on this occasion that she made the first offer on the home located at 5229 Drexel Drive, but it is also undisputed that Mrs. Dillon tendered no earnest money. In summary, Mrs. Dillon had visited the Lansdowne Subdivision on five distinct occasions. There is no testimony up to this juncture which would lend itself to a finding of any perpetration of discriminatory acts or conduct on behalf of the defendants, or their agent Mr. Guillot. This brings us up to May 14, 1973.

Mrs. Dillon testified that, with her offer to purchase in hand, she returned home and initiated the steps toward securing the financing necessary to purchase her new home. She called Gulf Federal Savings and Loan Association and spoke with one Mrs. Williams (an assistant of Mr. Davis, the Vice-President of Gulf Federal Savings and Loan Association) and informed Mrs. Williams that this was the *first time* that she had gone through the process of purchasing a home. Mrs. Dillon conveyed to Mrs. Williams the fact that she noted her offer to purchase the subject property had not been signed by the seller's agent. Mrs. Williams informed her that it was the usual procedure that such offer to purchase be signed by the seller's agent. Mrs. Dillon then contacted Mr. Guillot, who, upon the recognition of his oversight, informed Mrs. Dillon that he would bring a signed contract to her place of employment the following morning. However, Mr. Guillot did not show up the following morning, Tuesday, May 15, 1973, as he said he would. That afternoon, on her lunch period, plaintiff returned to the Lansdowne Subdivision to see Mr. Guillot, who, told the plaintiff that he would have the contract prepared later that afternoon. Mrs. Dillon testified that she thought that she was getting "the run-around" from Mr. Guillot but the Court finds that there are no facts upon which such a finding could be based, indeed, the testimony of plaintiff, Mrs. Dillon, indicates that the tact of Mr. Guillot could be characterized as "high pressure salesmanship".

Mrs. Dillon returned the afternoon of May 16, 1973 and obtained a signed contract from Mr. Guillot and placed a $100.00 deposit (plaintiffs' Exhibit No. 6), as a binder with her offer. Further, Mrs. Dillon testified that as a *condition* to her offer of May 16, 1973, that the following be included: "Mr. Dillon has to approve the sale of Lot 30 * * * subject to approval on 5–26–73 by Mr. Dillon".

We must now determine whether the offer of Mrs. Dillon made on May 16, 1973 "subject to approval on 5–26–73 by Mr. Dillon" constitutes such an offer that could bind the Dillons so that there was mutuality of obligation existing between the parties. In other words, was Mrs. Dillon's offer of May 16, 1973 such that either the Dillons or the sellers could insist upon specific performance of the contract? The Court must answer this in the negative since an offer is to be judged by its objective manifestation, not by any mental reser-

vations or subject interpretations or intentions of the offeror. It is well established in the law that a mere expression of intention or a general willingness to do something *on the happening of a particular event* does not amount to an offer. Further, it is fundamental that no person may be subjected by law to a contractual obligation, unless the character of the obligation is definitely fixed by an expressed or implied agreement of the parties.

It is well established in Alabama that: "It is elementary in the law that, for the validity of a contract, the * * * agreement of the parties to it must be certain and explicit, and that their full intention may be ascertained to a reasonable degree of certainty. Their agreement must be neither vague nor indefinite." *Butler v. Kremmerer,* 218 Pa. 242, 67 A. 332, 334.

The above proposition was espoused in the case of *Mozley v. Boen,* 41 Ala.App. 596, 143 So.2d 304. Correspondingly, the determination that an agreement is sufficiently definite is favored. *Smith v. Chickamauga Cedar Company,* 263 Ala. 245, 82 So.2d 200. Therefore, the Courts will, if possible, so construe the agreement as to carry into effect the reasonable intentions of the parties, if that can be ascertained. It is the absence of the very element of clarity of intentions on behalf of Mr. Dillon which precludes this Court from finding that the offer, tendered by Mrs. Dillon on May 16, 1963, constituted such an offer that would bind the seller, indeed, bind the purchaser, since such contract was "subject to the approval of" a third party not a signatory to the present negotiation and agreement. The offer of Mrs. Dillon to become effective, as an offer, must first be made in terms that are sufficiently clear in that it can be said that "mutuality of obligation had attached". In this regard, Mrs. Dillon testified that the sales agent, Mr. Guillot, represented to her that the contingent factor of her husband's approval could create "no problem". However, there was absolutely no mutuality of obligation which attached, in the legal sense, to the offer of May 16, 1973, and this Court so finds.

Mrs. Dillon then proceeded to Gulf Federal Savings and Loan Association and contacted Mr. Davis (the Vice-President of such organization) who informed her that he needed a specific address to commence the application for the mortgage. She obtained said address and the procedure was underway.

Mrs. Dillon again returned to Lansdowne Subdivision for a cursory inspection of the house (regarding the decor of the interior of the home) and again met with Mr. Guillot. This meeting took place on the 17th of May, 1973. Mr. Guillot informed the plaintiff that the seller could not accept the contract subject to the "approval of the sale" and tendered to Mrs. Dillon her $100.00 deposit check. Mrs. Dillon reassured Mr. Guillot that the "approval" of her husband was not necessary and authorized him to strike those portions of the offer, which he did, and received back her check for $100.00 issued the day prior, May 16, 1973. It was then and only then that an offer had been tendered by the plaintiffs to which mutuality of obligation could attach, if accepted by the seller, assuming that her husband would in fact sign on his return. It is any discriminatory acts or conduct after this which may have accrued to the plaintiffs' detriment which would have triggered the provisions of the Fair Housing Act, absent any evidence of a "ruse" or "device" utilized to unreasonably dissuade plaintiff in her attempt to purchase a new home at Lansdowne. Although Mrs. Dillon's testimony is not clear, she returned to Lansdowne Subdivision on either the 17th or 18th of May, 1973, and executed the agreement, absent the conditions of approval on behalf of her husband, which offer was to be communicated to the seller via Mr. Guillot. It is a fact that the third offer made by Mrs. Dillon was in fact signed by herself alone. However, she testified that she understood that it would have to be executed and signed by both her and her husband, this information coming to her from the officials of Gulf Federal Savings and Loan Association.

Mrs. Dillon testified that Mr. Guillot informed her that the owner-seller of the premises was out of town and not expected to return until Monday. It was on Monday, May 23, 1973 that the owner-seller (Brewton Greene, Jr.) declined the offer of the Dillons, remarking that the home had been taken off of the market and was sold to his (Greene's) daughter.

The testimony of Brewton Greene, Jr. was to the effect that Mr. Greene's wife had been experiencing severe emotional distress due to several extraneous domestic problems and arrangements were made to permit his daughter to move into the home located at 5229 Drexel Drive, and that Mr. Greene did not feel that his wife's emotional state at that juncture was sufficiently stable to inform her that he intended not to sell the home to her daughter but rather to a black couple. In this Court's opinion the testimony of witness Brewton Greene, Jr. was marked with racial overtones.

It is upon this factual setting that plaintiffs rely. The plaintiffs rely most heavily upon the case of *United States v. Reddoch,* 467 F.2d 897 (5th Cir. 1972). In *Reddoch* the defendants were partners owning an apartment complex in the City of Mobile, Alabama, which apartments were allegedly being operated in a racially discriminatory manner in violation of the Fair Housing Act. After a non-jury trial it was determined that the defendants as well as their agents, had followed a policy of racial discrimination in the rental of apartments which was successfully carried out to perpetuate the all-white character of the apartment complex.

In that case the two former assistant resident managers of the complex testified to having received racially discriminatory instructions from the resident manager (a managing agent of the partner-owners) and one of the defendants (a partner). Also, the resident manager herself testified as to her "anticipatory concern" over white backlash had blacks become tenants in the complex. Further, there was testimony that there had never been any black tenants in the complex during the three years of its operation, despite a 100% change in tenants during these three years. This was evidence upon which a finding was made that a pattern or practice of racial discrimination existed. There was further testimony that a ruse of a "credit check" was employed as a device in denying apartments to individuals solely because of race.

The *Reddoch* case is distinguishable in that there is no past history in the case sub judice pertaining to the sales of homes or lots in the Lansdowne Subdivision upon which to find a pattern or practice of racial discriminatory conduct. Indeed, there is testimony in the instant case that two other black families have moved into the Lansdowne Subdivision, although this testimony was to the effect that these move-ins were subsequent to that of the Dillons. There was no testimony which would lend itself to a finding by this Court that blacks, other than the Dillons, were discriminated against or shown any discrimination at the Lansdowne Subdivision. Lansdowne was a blossoming new development with many unimproved lots remaining.

The second distinguishing feature from the *Reddoch* case is that there is no testimony upon which to predicate a finding that Mr. Guillot, or any other sales representative of the owner-seller or Riley Smith, Inc., was given racially discriminatory instructions regarding the sale of homes or lots to blacks. Thirdly, there had been no allegation by plaintiffs that a "ruse" or other device similar thereto was utilized by any of the defendants in the case at bar.

The cases are consistent in one regard: there is testimony in the case at bar which lends itself to "anticipatory concern over white backlash", which was generally discussed between Riley B. Smith and Brewton Greene, Jr. This, coupled with an established pattern or practice, as was found in *Reddoch* was evidence which tends to establish such pattern or practice, i. e., a history of conduct with a shown racially discriminatory impact, justifying the attachment of legal liability for such conduct, as was done in *Reddoch,* but, since only one-half of the question is the only consist-

ent strain between the two cases, this Court is of the opinion that *Reddoch* is not here controlling.

The plaintiffs also rely heavily on the case of *Jeanty v. McKey & Pogue, Inc.,* 496 F.2d 1119 (7th Cir. 1974) which is cited for the proposition that selling agencies or agents are liable under law for refusals to sell when based on race even if they do no more than relate such refusals to the respective buyers. Such persons are found liable for their own unlawful conduct even where their actions were at the behest of their principal.

The situation in *Jeanty* is consistent with *Reddoch* in that there was a "ruse" utilized. In *Jeanty* it was that the owner would no longer rent to single men. The Court found that this was a subterfuge and concluded that the refusal to rent to the plaintiff was racially discriminatory. There is no doubt that any agent would be held responsible for any *unlawful conduct* where such unlawful conduct was requested to be performed by said agent's principal. This would, in a sense, constitute a conspiracy, or a confederation in action by the agent and the principal to obtain an unlawful end. The testimony in the case at bar does not lend itself to a finding that there was a concert of action between AFBIC, Brewton Greene, Jr., Riley Smith, Inc. and Riley B. Smith. The testimony clearly exculpates AFBIC in that there was no testimony of unlawful conduct on behalf of AFBIC as regards the Dillons. There is no doubt that Brewton Greene, Jr. may have been racially motivated in his actions in refusing to accept the offer of the Dillons as proposed by the Dillons on May 17th or 18th, 1973. Indeed, this liability was ultimately settled between the parties as a part of this law suit. Under the *Jeanty* case we must look to the conduct of Greene's agent, Riley Smith, Inc. (or Riley B. Smith or Mr. Guillot) and determine whether or not any conduct by the defendants, or its employees, constituted "unlawful conduct" specifically arising from any intent to promote racially discriminatory conduct. Absent such a finding *Jeanty* would not be controlling in these circumstances.

The plaintiffs have characterized the association, if the term can be used, between AFBIC, Riley Smith, Inc. (Riley B. Smith) and Bay City Construction Company (Brewton Greene, Jr.) as a "joint venture" insofar as the "financial" aspects of the Lansdowne Subdivision are concerned. The definition of a joint venture has been defined in the case of *The Great Atlantic And Pacific Tea Company v. Gilley,* 28 Ala. App. 360, 184 So. 286 (1938) as follows:

"A special combination of persons undertaking jointly some specific adventure for profit, without any actual partnership or corporate designation; an association of persons to carry on a single business enterprise for profit, for which purpose they combine their property, money, effects, skills and knowledge".

Cited in *Gilley,* supra, is the case of *Crescent Motor Company v. Stone,* 211 Ala. 516, 101 So. 49 in which the Court stated:

"Our Supreme Court has said that parties are not engaged in a joint enterprise, within the law of negligence, unless there is a community of interest in the objects or purposes of the undertaking, *and an equal right to direct and govern the movements and conduct of each other* in respect thereto".

We must look to the right to direct and govern, if any, that Brewton Greene, Jr. had over Riley Smith, Inc. and vice versa before we can impose that status of joint venture upon these various and independent defendants. There was testimony to the effect that Riley Smith, Inc. had the exclusive right to sell homes in the Lansdowne Subdivision, although Riley Smith, Inc. would readily work with other realtors to place prospective purchasers in Lansdowne. To this extent Riley Smith, Inc. had *control* over the owner-seller, Brewton Greene, Jr. On the other hand, Brewton Greene, Jr. did not yield his right to sell, in an exclusive fashion, to Riley Smith, Inc. Rather, he reserved in himself the right to sell to others, outside of those offers presented to him by Riley Smith, Inc. To this extent there is

a void as to any aspect of "an *equal right to direct and govern* the movements and *conduct* of each". Riley Smith, Inc. nor Riley B. Smith, individually, had the right to question Brewton Greene, Jr.'s ability or right to sell to those outside of the offers tendered by Riley Smith, Inc. This distinguishing feature is the death knell insofar as having *Jeanty* control in the premises, as well as being a death knell to liability on behalf of the defendant Riley Smith, Inc., AFBIC or Riley B. Smith, individually. There is no doubt that Riley B. Smith as well as Riley Smith, Inc. retained the "right to direct and govern the movements and conduct of" its sales representative, Mr. Guillot; however, this Court is of the opinion that no acts, conduct or demeanor of Guillot have been presented to this Court upon which this Court could find that there was racial motivation, contrary to the law, practiced upon the plaintiffs by him.

■ This Court is then left to determine the liability in the instant case on the ground that there was "anticipatory concern over white backlash" if homes were sold in what has been characterized to this Court as an "all-white neighborhood". Keeping in mind that there are many factors which affect the day to day conduct of business regardless of the character of the business, we must determine whether such "anticipatory concern" can be made the basis of legal liability sufficient enough to trigger the provisions of the Fair Housing Act. In a rather eloquent opinion Judge Jerome Frank in *In re: J. P. Linahan,* 138 F.2d 650, 651–654 (2nd Cir. 1943) had the following to say regarding prejudice:

" * * * We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are pre-judices. Without acquired 'slants,' pre-conceptions, life could not go on. * * * 'To live is to have a vocation, and to have a vocation is to have an ethics or scheme of values, and to have a scheme of values is to have a point of view, and to have a point of view is to have a prejudice or bias * * *'. * * * More directly to the point, every human society has a multitude of established attitudes, unquestioned postulates. Cosmically, they may seem parochial prejudices, but many of them represent the community's most cherished values and ideals. Such social pre-conceptions, the 'value judgments' which members of any given society take for granted and use as the unspoken axioms of thinking, find their way into that society's legal system, become what has been termed 'the valuation system of the law'."

It is this bit of wisdom which leads to the conclusion that, in all men resides a bias or prejudice. And in each man resides a degree of control that he may exercise over these resident biases and prejudices. It is only when man, in our society, fails to exercise that degree of control, recognized by our law as that degree of control imposed upon society as a whole, as a governing standard that gives rise to a legal liability for the failure to control such resident biases and prejudices.

■ We must further couple this failure to exercise or control inate biases and prejudices with a doctrine of liability that will permit such bias and prejudice to flow from one person to another where there is a chain used in communicating racially discriminatory conduct against an aggrieved plaintiff. There is no doubt that the vicarious liability doctrine applies in the case where an employee-servant commits a tortuous act, in the course of business, and against one who suffers a loss as a result thereof, but the law does not permit liability to flow, under any doctrine, when the tortuous conduct flows from the employer-master to his employee-servant, intended to reach the plaintiff, where the employee-servant fails to communicate that bias or discrimination to the detriment of the alleged plaintiff. Such was the conduct of Mr. Guillot in the instant case.

■ There is testimony in this cause which can be argued as supporting the conclusion that Riley B. Smith demonstrated

an anticipatory concern over white backlash if· blacks became residents in Lansdowne. To deny such would be to deny that Mobile is in Alabama. That is not to say however, that this resident bias and prejudice was such as did ultimately lead to the detriment of the plaintiffs. The evidence clearly shows Guillot's conduct in any event intervened and, acted as an insulator due to his encouraging conduct toward plaintiff. Other than mouthing a fact of life, the evidence does not show any act of discrimination by Riley B. Smith or Riley Smith, Inc., but even if it did, such act or acts were effectively precluded from resulting in any racial discriminatory practice from these defendants to the plaintiffs, where as here, the testimony of Guillot and Bryson Hill show it was not translated by them in their efforts or acts in affecting the sale.

In *Reddoch* and *Jeanty,* a legal duty arose on behalf of both the resident managers and managing agent to preclude the exercise, by their principal, of acts or conduct which were racially motivated or which had a disparate racial impact upon minorities. Unless or until this same affirmative duty of agency is fixed upon AFBIC and/or Riley Smith, Inc. or Riley B. Smith, there can be no legal liability which attaches to these defendants as a result of conduct of another and independent entity, Bay City Construction Company and/or Brewton Greene, Jr., whose acts or conduct resulted in injury to the plaintiffs. Since there was no right to control or govern or direct Brewton Greene, Jr. there is no duty upon which plaintiffs could predicate a civil action.

We must then inquire whether the exercise of the right retained by Brewton Greene, Jr., i. e., the right to sell to anyone he so chose to sell to, when coupled with a racially motivated reason, is sufficient to predicate a theory of legal liability upon which would justly obligate the remaining defendants in this cause. The law is clear that if Brewton Greene, Jr. communicated to Riley B. Smith the fact that he refused to sell to the plaintiffs solely on the basis that they were black, and had that

been communicated to the plaintiffs via Riley B. Smith or through his employee, Mr. Guillot, the provisions of the Fair Housing Act would have been triggered and there would have been established, pursuant to the holdings in *Reddoch* and *Jeanty* a theory of legal liability upon which the defendants could be held responsible. That is not the evidence in the case at bar. Brewton Greene, Jr. testified that his refusal to sell to the plaintiffs was two-fold: (1) that he had taken the home from the market with the specific intent to sell it to his daughter who· was plagued with financial problems and (2) that he was concerned that his wife would not be able to emotionally tolerate the fact that a black was to be their neighbor rather than their daughter, both of which were communicated to Riley B. Smith on Monday, May 23, 1973. There is further testimony that Brewton Greene, Jr. was out of town the weekend of May 18, 1973, and that he communicated to Riley B. Smith, upon his return to Mobile, his denial of the offer of the Dillons on Monday, May 23, 1973. There is no evidence as to when his decision to sell the home to his daughter was made. Arguendo, if the decision was reached on May 23, 1973, when Riley B. Smith tendered the offer of the Dillons to Brewton Greene, Jr. any racially motivated denial of such an offer would be actionable. On the other hand, if Greene's decision to sell to his daughter was made on Friday, May 18, 1973, prior to the tender of the offer, via Riley B. Smith, it would be a mere exercise of his retained right to sell to whomever he chose for which no cause of action would accrue on behalf of the plaintiffs.

On the facts of the case at bar this Court is of the opinion that the plaintiffs have failed to establish any theory of liability which could join the defendants, AFBIC, Riley Smith, Inc. and Riley B. Smith under the theory that they were in a "joint venture". Further, this Court is of the opinion that the defendants were not engaged in a "joint venture", there being no mutual right to direct or govern each other in the conduct of their business in and about the Lansdowne Subdivision. Therefore the acts

581

of Brewton Greene, Jr. stand alone and these have in fact been rectified.

■ We turn our attention now to the allegations of the complaint which seek injunctive relief against Riley Smith, Inc. Defendants Riley Smith, Inc. and Riley B. Smith executed with the Department of Housing and Urban Development and the Veteran's Administration, the contractual agreement introduced as defendants' Exhibit No. 2 and captioned "Joint HUD/VA Non-discrimination Certification". This agreement provides, inter alia, that defendants will instruct their staff on non-discrimination policies and laws, that they will display the Fair Housing poster in all offices, that they will use the approved Fair Housing statement in all advertisements, they will use any available minority media in advertising, that they will maintain a non-discriminatory hiring policy in affirmatively recruiting from both minority and majority groups. There is no doubt that the plaintiffs and the class they represent are third party beneficiaries of the aforesaid agreement between the government and these defendants and are entitled to enforce such contracts. *Lau v. Nichols,* 414 U.S. 563, 568–69, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974); *Bossier Parish School Board v. Lemon,* 370 F.2d 847 (5th Cir. 1967), *cert. den.* 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350 (1968).

During the trial of this cause there was testimony from Guillot that defendant, Riley Smith, Inc., did not maintain a fair housing poster in the Lansdowne Subdivision sales office. However, the testimony of Bryson Hill was to the effect that there was in fact a fair housing poster displayed in the sales office at the Lansdowne Subdivision. The testimony of Guillot, coupled with the conspicuous absence of the local newspaper of the fair housing logo gives rise to concern by the Court that these realtors, although they have agreed to abide by the provisions of the Fair Housing Act, may in fact not have done so or not have done so fully as per their agreement.

The bulk of the defendants' advertising is done in the newspaper, all of the evidence showing that relatively little benefit was derived by using the radio and television. The testimony also clearly establishes that the minority newspaper, Mobile Beacon, reaches a very limited segment of the minority population and though its editor anticipates a growing circulation, this has not transpired and if the minority market is to be reached at all it is best reached through the Mobile Press Register.

Copies of ads in the Mobile Press Register were introduced, none of which reflected a compliance with the requirements of the contract for the use of the logo, etc. A search of the paper reflected that the paper itself did not carry any indication that its advertisers were equal housing opportunity sales offices. Contracts are not made to be ignored and the plaintiffs and the class they represent are entitled to the enforcement of this aspect of the contract which the defendants have with the government and to that end injunctive relief is appropriate.

The evidence in this case establishes that the defendants, Riley Smith, Inc. and Riley B. Smith do a limited real estate business now and particularly in the sale of homes. In the past they have been responsible for the development and sale of several subdivisions, but that type of business is no longer the active part of their enterprise. The evidence also shows that where there has been no active solicitation of minority business, neither has there been an active refusal to handle minority business. It thus appears little or no benefit would derive to the plaintiffs' class from the actions or lack of actions of this agency in the future. However, having contracted not to discriminate and having acknowledged the requirement otherwise imposed upon them not to discriminate, they do not resist prospective injunctive relief which would preclude them from so doing in the future. Therefore, such relief is appropriate and to be granted.