USCA1 Opinion

 

 United States Court of Appeals United States Court of Appeals For the First Circuit For the First Circuit ____________________ No. 94-1568 RAYMOND BOURQUE, Plaintiff, Appellant, v. FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER/LIQUIDATOR AGENT FOR EASTLAND BANK AND NEWMARK INVESTMENTS, INC., Defendant, Appellee. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Francis J. Boyle, Senior U.S. District Judge] __________________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Stahl, Circuit Judge. _____________ ____________________ Robert Corrente with whom Anthony F. Cottone and Corrente, Brill ________________ __________________ _______________ & Kusinitz, Ltd. were on brief for appellant. ________________ Sharon C. Boyle with whom Marian Van Soelen, and Russell L. Chin _______________ _________________ ________________ and Associates, P.C. were on brief for appellees. ____________________ ____________________ December 28, 1994 ____________________ STAHL, Circuit Judge. Plaintiff-appellant Raymond STAHL, Circuit Judge. _____________ Bourque commenced this breach of contract action in district court against defendants-appellees Federal Deposit Insurance Corporation ("FDIC") and Newmark Investments, Inc. ("Newmark") (collectively, "defendants"). Bourque claims that the FDIC and Newmark agreed to sell him a piece of property in Woonsocket, Rhode Island, for $130,000. The defendants denied that a contract had been formed and filed separate motions for summary judgment. The district court granted defendants' motions, and Bourque appeals. We affirm. I. I. __ BACKGROUND BACKGROUND __________ The FDIC is the receiver and liquidating agent of Eastland Savings Bank of Woonsocket. In its capacity as receiver, the FDIC is the sole shareholder of Newmark, a wholly-owned subsidiary of Eastland. In December 1992, Newmark retained the FDIC to market its real estate assets, including the property at issue here. On June 1, 1993, Bourque's attorney, Edward J. Casey, wrote to FDIC account officer Curtis Cain that Bourque was interested in purchasing the property at 846 Cumberland Hill Road in Woonsocket (the "Property"). Casey asked Cain whether he was "the person handling the asset," whether he had authority "to discuss" the Property, and what the current status of the Property was. At Cain's direction, Cain's -2- 2 assistant contacted Casey and informed him that Cain was indeed the person "handling" the Property, but she apparently did not inform Casey of any limitations on Cain's authority to sell the Property. On June 11, 1993, Casey sent Cain a letter offering to buy the Property on Bourque's behalf for $105,500. Casey enclosed a $10,000 earnest money deposit and an FDIC purchase-and-sale agreement form signed by Bourque that described the Property and the terms of the offer. Cain's response, dated June 23, 1993, (the "June 23 letter") was printed on FDIC Division of Liquidation letterhead and bore the heading "NOTICE OF REJECTION OF NOTICE OF REJECTION OF OFFER". The letter's critical paragraph read as follows: OFFER This letter is to advise you that FDIC is unable to accept Mr. Bourque's offer. FDIC's counter offer is $130,000.00. All offers are subject to approval by the appropriate FDIC delegated authority. FDIC has the right to accept or reject any and all offers. I am returning your customer's contract of sale and earnest money deposit. If your customer wishes to accept this counter offer, please return the amended Purchase & Sale Agreement to me. Cain did not return Bourque's $10,000 deposit. Indeed, the FDIC deposited the check "by mistake," according to the deposition testimony of Cain's supervisor, Donald Lund. Cain also failed, contrary to FDIC policy, to attach a standard "Letter of Understanding" to the FDIC purchase-and-sale agreement form he returned to Casey along with the rejection -3- 3 notice. That form letter explicitly states that the FDIC account officer has no delegated authority to accept an offer and that "[n]o contract will arise" until the appropriate delegated authority notifies the offeror that it has accepted the offer. Under FDIC policy, account officers may suggest and negotiate terms and recommend appropriate offers for approval by the proper delegated authority, but they do not have the authority to liquidate FDIC assets by binding contracts. That authority is conferred on other job titles; in this case, the sale of the Property could have been approved by an FDIC assistant managing liquidator. Other than Cain's June 23 letter, there is no evidence that anyone at the FDIC communicated this policy to Casey or Bourque in connection with the transaction before this dispute arose. John Chiungos, another FDIC account officer, however, testified at his deposition that he had explained the policy to Casey in connection with another, smaller transaction in January 1993. At his deposition, Casey at first testified that he had never had prior dealings with the FDIC; then, when confronted with documentary evidence of the prior transaction, he said he had "completely forgot" about it. In any event, Casey did not rebut Chiungos' testimony that Chiungos had explained the FDIC liquidation policy to Casey at least on one prior occasion. -4- 4 On June 25, 1993, Casey returned to Cain the purchase-and-sale agreement, which was signed by Bourque and amended to indicate a $130,000 purchase price (the "Agreement"). The Agreement set forth July 30, 1993, as the closing date for the transaction. On July 7, 1993, another FDIC account officer, Elizabeth M. Carroll, informed Casey by telephone that the FDIC had received an offer on the Property substantially in excess of $130,000.1 Casey responded by sending Carroll a letter stating that Bourque considered the parties to be bound by contract and that Bourque would litigate, if necessary, to obtain the benefit of his bargain. On July 27, 1993, Carroll sent a letter to Bruce E. Thompson, Casey's law partner, stating that the FDIC would not accept Bourque's $130,000 offer, but that Bourque could submit another offer of at least $250,000 by that afternoon for consideration by the appropriate FDIC delegated authority. In her letter, Carroll wrote:  ____________________ 1. Prior to working for the FDIC, Carroll worked for seven years at Eastland, initially as an assistant to Arthur Gauthier, Eastland's executive vice-president for real estate. Gauthier is the real estate agent who brokered this higher (and ultimately successful) offer for the Property, and his office stands to receive a 4.5% commission on the $253,000 transaction. Carroll's supervisor, Donald Lund, testified at his deposition that had he known of Carroll's past working relationship with Gauthier, he would not have let her market the Property to him. While these questionable dealings indicate that the FDIC may wish to review its oversight practices, they do not animate our decision in this case. -5- 5 After reviewing the file and conferring with the previous account officer, it is clear that the FDIC's policy that account officers have no authority to bind the FDIC or its subsidiary corporation was communicated to your client. Mr. Cain indicated to your client that his authority is limited to recommending an offer and that all final offers are subject to approval by the appropriate delegated authority. On August 2, after the FDIC refused to sell the property to Bourque, Bourque filed a notice of lis pendens on the property and instituted this action, seeking specific performance from either FDIC or Newmark, and damages from the FDIC.2 The defendants filed separate summary judgment motions, arguing that there was no contract between the parties, that the alleged contract violated Rhode Island's Statute of Frauds and that Cain did not have actual or apparent authority to bind the FDIC or Newmark. A magistrate judge recommended that the motions be granted, and following oral argument, the district court adopted that recommendation.3 This appeal ensued.  ____________________ 2. On August 9, 1993, the FDIC entered into an agreement to sell the Property to Supreme Corporation of Goshen, Indiana, for $253,000. The closing of that sale has been postponed pending the outcome of this case. 3. Although the district court's order does not so state, the transcript of the oral argument clearly indicates that the district court based its decision on the contract formation issue and never reached the apparent or actual authority issues. The district court also suggested that had it found that a contract was formed, it would also have held -6- 6 II. II. ___ DISCUSSION DISCUSSION __________ We begin by reviewing traditional summary judgment principles and how they apply in contract formation disputes. With those principles in mind, we then turn to Bourque's substantive argument that summary judgment is inappropriate. Because our resolution of the contract formation issue is dispositive, we do not reach the statute of frauds or agency issues. A. Summary Judgment in Contract Formation Disputes ___________________________________________________ We accord a district court's grant of summary judgment no deference; the scope of our review is plenary. Alan Corp. v. International Surplus Lines Ins. Co., 22 F.3d __________ _____________________________________ 339, 341 (1st Cir. 1994). We affirm a grant of summary judgment if our evaluation of the parties' proof on file -- viewing the evidence in the light most favorable to the nonmovant -- reveals "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." NASCO, Inc. v. Public Storage, ___________ _______________ Inc., 29 F.3d 28, 32 (1st Cir. 1994) (quoting Fed. R. Civ. P. ____ 56(c)). An issue is only "genuine" if there is sufficient evidence to permit a reasonable jury to resolve the point in the nonmoving party's favor, NASCO, 29 F.3d at 32, while a _____ fact is only "material" if it has "`the potential to affect  ____________________ that Rhode Island's Statue of Frauds was satisfied. -7- 7 the outcome of the suit under the applicable law.'" Id. ___ (quoting Nereida-Gonzalez v. Tirado-Delgado, 990 F.2d 701, ________________ ______________ 703 (1st Cir. 1993)). It is an axiom of modern contract law that the formation of a contract requires the "manifestation of mutual assent" by the parties to the agreement. See Restatement ___ ___________ (Second) of Contracts 17 (1981). Under Rhode Island's law ______________________ of contracts,4 we look to the parties' words and actions to determine whether they have manifested the objective intent _________ to promise or be bound. Smith v. Boyd, 553 A.2d 131, 133 _____ ____ (R.I. 1989). This manifestation "almost invariably takes the form of an offer or proposal by one party accepted by the other party or parties." McLaughlin v. Stevens, 296 F. Supp. __________ _______ 610, 613 (D.R.I. 1969) (interpreting Rhode Island law). Determining whether there was mutual assent may involve factual questions: What did the parties say (or do) to manifest their intent? Were the parties' understandings of each other's actions reasonable under all the circumstances? Answering these questions is the province of the factfinder and not the court. See Salem Laundry Co. v. New England ___ __________________ ___________ Teamsters and Trucking Indus. Pension Fund, 829 F.2d 278, 280 __________________________________________ (1st Cir. 1987) (stating that it is "a question of fact  ____________________ 4. The parties do not dispute that Rhode Island contract law governs the interpretation and construction of the alleged contract. To the extent that Rhode Island case law does not directly address the issues here, we look to other sources of general contract law, as would a Rhode Island court. -8- 8 whether any particular conduct or actions imply a contractual understanding" (internal quotation omitted)). Like other questions of fact, however, there is sometimes no genuine issue as to whether the parties' conduct _______ implied a "contractual understanding." The words and actions that allegedly formed a contract may be "`so clear themselves that reasonable people could not differ over their meaning.'" FDIC v. Singh, 977 F.2d 18, 21 (1st Cir. 1992) (quoting ____ _____ Boston Five Cents Sav. Bank v. Secretary of Dep't of HUD, 768 ___________________________ _________________________ F.2d 5, 8 (1st Cir. 1985)). In such cases, "the judge must decide the issue himself, just as he decides any factual issue in respect to which reasonable people cannot differ." Boston Five Cents Sav. Bank, 768 F.2d at 8. Even if the _____________________________ language of a purported contract is ambiguous, summary judgment is appropriate when the extrinsic evidence about the parties' meaning is "`so one-sided that no reasonable person could decide the contrary.'" Allen v. Adage, Inc., 967 F.2d _____ ___________ 695, 698 (1st Cir. 1992) (quoting Boston Five Cents Sav. ________________________ Bank, 768 F.2d at 8). A corollary of this last proposition ____ is that even if the language of purported assent is susceptible of more than one reasonable interpretation, summary judgment is nevertheless appropriate if none of those interpretations would support the nonmovant's legal argument. See O'Connor v. McKanna, 359 A.2d 350, 354 (R.I. 1976) ___ ________ _______ (stating that summary judgment must be denied if the -9- 9 factfinder "could reasonably adopt the opposing party's version as to what was said and done and intended by the parties"); Knight v. Sharif, 875 F.2d 516, 523 (5th Cir. ______ ______ 1989) (granting summary judgment in contract formation dispute where nonmovant was unable to "provide a plausible interpretation" of the documents at issue that would support his argument that a contract had been formed). Placed in the context of this case, Bourque can avoid summary judgment only if we are able to discern a reasonable interpretation of Cain's June 23 letter that supports Bourque's legal argument -- that Cain's June 23 letter constituted an unequivocal offer to sell Bourque the Property for $130,000. This we are unable to do. B. The Law of Offers _____________________ An offer is a "manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and ___ will conclude it." Restatement (Second) of Contracts 24 at ________________ _________________________________ 71 (1981) (emphasis supplied). See also 1 Corbin on ___ ____ __________ Contracts 1.11 at 31 (rev. ed. 1993) ("So long as it is _________ reasonably apparent that some further act of the purported offeror is necessary, the purported offeree has no power to create contractual relations, and there is as yet no operative offer."). -10- 10 The fact that a party uses the word "offer" or "counteroffer" in a communication with another party "is deserving of weight, but it is not controlling, and a court may decide that what is called an offer is merely an _____ invitation to the recipient to make an offer." E. Allen Farnsworth, Contracts 3.10, at 139 (2d ed. 1990). "On the _________ other hand, the insertion into a proposal of a clause that reserves to its maker the power to close the deal is a compelling indication that the proposal is not an offer." Id. Thus, in Foster & Kleiser v. Baltimore County, 470 A.2d ___ ________________ ________________ 1322, 1326 (Md. Ct. Spec. App. 1984), an agreement by which Baltimore County purported to purchase land, but that contained a clause stating that the agreement was null and void if not approved by the county council, was held merely part of preliminary negotiations because the seller of the land "could not have accepted [the county's] `offer' without further action by the County." See also Dillon v. AFBIC Dev. ___ ____ ______ __________ Corp., 420 F. Supp. 572 (S.D. Ala. 1976), aff'd in part and _____ _________________ rev'd in part, 597 F.2d 556 (5th Cir. 1979) (holding that _____________ woman's "offer" to purchase house "subject to approval" by husband lacked clarity of intent and mutuality of obligation and was therefore not an offer that, without more, could bind the parties); Engineering Assocs. v. Irving Place Assocs., ___________________ _____________________ 622 P.2d 784, 787 (Utah 1980) (holding that letter "offering" to make mortgage loan, with the agreement to become binding -11- 11 upon execution of documents by "offeror's" chairman, was merely invitation to submit offer, because purported offeror "reserved to itself the last act in the formation of any agreement between the parties"). Bourque argues that cases such as Dillon and Foster ______ ______ & Kleiser are inapposite because the purported offerors in _________ those cases clearly reserved authority to take further action, while Cain did no such thing. We agree that Cain could have expressed his intention with more clarity, and we do not base our decision primarily on these cases. Rather, we recognize that where intent and the meaning of contract language are at issue, cases in which different parties had an entirely different set of communications are of limited precedential value. Nevertheless, we think that these cases do support the general principle that unequivocal language of offer or acceptance cannot be taken in isolation from other, qualifying language in the document and that where the unqualified statement and the qualification coexist, the qualification is likely to control, at least in the context of offer and acceptances. C. Interpreting the June 23 Letter ___________________________________ In arguing that Cain's June 23 letter contained an offer that bound the FDIC and Newmark, Bourque focuses our attention on the second and sixth sentences of the letter's critical paragraph: "FDIC's counter offer is $130,000.00. . -12- 12 . . If your customer wishes to accept this counter offer, please return the amended Purchase & Sale Agreement to me." Bourque argues that these words are unequivocal, conveying no possible meaning other than that the FDIC was offering the Property to Bourque for the stated price, and that Bourque could accept the offer in the prescribed manner. If Cain had written no more than those two sentences, then Bourque's acceptance may well have formed a contract between the parties. But Cain's letter did say more, and it is a fundamental tenet of Rhode Island and general contract law that "[i]n ascertaining what the [parties'] intent is we must look at the instrument as a whole and not at some detached portion thereof." Hill v. M. ____ __ S. Alper & Son, Inc., 256 A.2d 10, 15 (R.I. 1969). See also ____________________ ___ ____ In re Newport Plaza Assoc., 985 F.2d 640, 646 (1st Cir. 1993) __________________________ (applying Rhode Island law and stating that "a court is duty bound to construe contractual terms in the context of the contract as a whole"); Dial Media, Inc. v. Schiff, 612 F. _________________ ______ Supp. 1483, 1488 (D.R.I. 1985) ("An interpretation which gives reasonable and effective meaning to all manifestations ___ of intent is to be preferred to one which leaves part of the manifestation of no effect.") (emphasis supplied). Immediately following the sentence "FDIC's counter offer is $130,000.00," Cain wrote: "All offers are subject to approval by the appropriate FDIC delegated authority. -13- 13 FDIC has the right to accept or reject any and all offers." The defendants argue that these sentences clearly and unambiguously attached a condition to Cain's $130,000 counteroffer: the approval of the offer by the appropriate FDIC authority. Bourque argues that these sentences, when read in the context of the entire paragraph and Casey's prior communications with Cain, did nothing to dispel his reasonable understanding that he could indeed enter into a binding contract by performing the act prescribed by Cain in the letter's final sentence. At the very least, Bourque argues, the paragraph is ambiguous and should be construed against the FDIC, since it drafted the document. At oral argument, Bourque's counsel stated that, under the circumstances of this case,5 where Cain had told Casey that he was the person "handling" the Property, the paragraph at issue could only mean that the writer of the letter himself -- i.e., Cain -- was the appropriate FDIC delegated authority and that he included the "subject to approval" language even though he had already approved the $130,000 figure. This interpretation, rather than giving a "reasonable and effective meaning" to the paragraph's third  ____________________ 5. In his brief, Bourque points to the FDIC's deposit of his $10,000 earnest money check as another reason why summary judgment should not be granted. He fails to explain, however, exactly how this action could be understood as a manifestation of intent in light of Cain's express statement in the June 23 letter that he was returning the check to Bourque. -14- 14 and fourth sentences, foists upon them a tortured, illogical reading. An offer cannot be both subject to approval and already approved: it is either one or the other.6 Nor would one reasonably expect the "appropriate delegated authority" -- even of the FDIC -- to refer to himself in the third person in proclaiming that he retained the power to approve all offers. One would understand that the appropriate authority must be someone else. Bourque attempts to avoid these linguistic obstacles by emphasizing that, on its own terms, Cain's letter distinguishes "counter offers" from "offers." Thus, so this argument goes, the third and fourth sentences of the letter reserve FDIC approval only for "offers" -- i.e., offers to buy the Property for less than $130,000 -- and not ______ for the FDIC's "counter offer" to sell it at the specified  ____________________ 6. Under Rhode Island contract law, "unless a plain and unambiguous intent to the contrary is manifested, the words used in the contract are assigned their ordinary meaning." Westinghouse Broadcasting Co. v. Dial Media, Inc., 410 A.2d ______________________________ _________________ 986, 991 (R.I. 1980). "[W]e look in the first instance to the dictionary meaning of the language at issue to determine its ordinary meaning." Id. at 992 n.11. The word "subject," ___ when used as an adjective, has several possible meanings, according to Webster's Third New International Dictionary. ______________________________________________ The only meaning that makes any sense in the context of the June 23 letter, however, is "likely to be conditioned, affected, or modified in some indicated way: having a contingent relation to something and usu[ally] dependent on such relation for final form, validity, or significance." Webster's Third New International Dictionary 2275 (1986). _______________________________________________ This meaning, implying future action, is inconsistent with Bourque's purported understanding that the offer had already been approved. -15- 15 price, which the paragraph's final sentence unambiguously holds out for acceptance by a prescribed method. This interpretation fails too, however, for it places undue reliance on the presence of the words "counter" and "accept," while glossing over the manifestation of reluctance to be __________ bound contained in the third and fourth sentences. It is axiomatic that a counteroffer is simply an offer that operates also as a rejection of a previous offer; it is still very much an offer. See Restatement (Second) of ___ _______________________ Contracts 39 (1981). Bourque's argument assumes that the _________ use of the word "counter" by Cain removed the FDIC's $130,000 "offer" from the set of offers referred to in the very next sentence: "All offers are subject to approval by the ___ appropriate FDIC delegated authority." (emphasis supplied) There is nothing magical about the word "counter," however; it is merely a descriptive term, letting us know that another offer preceded the counteroffer and was rejected, either explicitly or implicitly by the making of the counteroffer. Bourque responds to the fact that a counteroffer is "technically" an offer by calling it a "legalistic obfuscation" that ignores the fact that the FDIC "explicitly empowered Bourque to accept its counteroffer, and told him how to do so." We respond thusly. First, it is hardly a technical, legalistic obfuscation to say that counteroffers -16- 16 are offers; we think that is rather elementary. Second, Casey is a lawyer, and had some familiarity with how the FDIC works; even if this argument is "legalistic," it is not one that should have entirely eluded him when he read the letter. See Trifiro v. New York Life Ins. Co., 845 F.2d 30, 33 (1st ___ _______ _______________________ Cir. 1988) (stating that when confronted with conflicting manifestations of intent, "a reasonable person investigates matters further; he receives assurances or clarification before relying"). Third, the FDIC only "empowered Bourque to accept its counteroffer" according to the terms of that offer, which included obtaining the approval of the appropriate delegated authority. See In re Newport Plaza ___ ____________________ Assoc., 985 F.2d at 645 (stating that under Rhode Island law, ______ the offeror controls the offer and the terms of its acceptance). Bourque attaches great significance to the fact that Cain, through his assistant, confirmed to Bourque that he was indeed the person "handling" the Property and that he did not expressly state that his authority to sell the Property was limited. We deal with the latter point first. Cain did in fact state that his authority was limited, by informing Casey that "[a]ll offers are subject to approval by the appropriate delegated authority." As we explained above, Cain cannot reasonably be viewed as referring to himself here. As for -17- 17 Cain's statement that he was "handling" the Property, he was indeed: he was handling bids on the Property, much like a real estate agent or a loan officer at a bank "handles" preliminary negotiations before submitting a tentative agreement or offer to the principal for approval. "Handling" is not a synonym for "authorized to sell." Hence, Cain's answer to Casey's query that he was the FDIC person with whom Casey should be dealing was correct, and should not have suggested to Casey that Cain was vested with authority to close a deal for the Property. While hardly a model of clarity,7 we nevertheless hold that the only reasonable interpretation of the entire paragraph at issue places the recipient of the letter on notice that the FDIC's "counter offer" of $130,000 was subject to further approval. This interpretation gives a reasonable meaning to each sentence; it alters the plain  ____________________ 7. Following the initiation of this lawsuit, the FDIC changed the "macros" on account officers' computers so that they could not fire off "counteroffers" with a simple keystroke. If Cain were to write his letter today, it would not contain the word "counteroffer," but would instead invite another offer from Bourque. We agree that handling the transaction in this way provides the potential buyer virtually no opportunity to mistake the FDIC's communication as an offer, and we would no doubt not be deciding this case had the FDIC taken this step in responding to Bourque's first offer. Nevertheless, just as a subsequent modification does not prove negligence in a defective design case (indeed, it is not even admissible for that purpose under the Federal Rules of Evidence), the FDIC's change is not probative of what Cain's letter meant to a reasonable reader in Bourque's position (i.e., one aided by an attorney such as Casey). -18- 18 meaning of the paragraph's second and last sentences -- the apparent extension of an offer and the invitation of acceptance by a prescribed method -- only if one reads those particular sentences in isolation. When read as a whole, as it must be read, the paragraph sets forth with sufficient clarity that the recipient may "accept" Cain's "counteroffer" of $130,000, but only subject to final approval by the appropriate FDIC authority. We are unable to discern any other reading of the paragraph -- and Bourque has not guided us to one -- that gives some reasonable meaning to each sentence. D. Conclusion: The June 23 Letter Was Not an Offer ___________________________________________________ Because the only reasonable interpretation of the June 23 letter is that Casey's "acceptance" of the counteroffer would still be subject to approval, Casey was not justified in believing that his assent to the offer would conclude the deal; it was "reasonably apparent" that some further act by the FDIC would be necessary to close the deal. Cain's June 23 letter, therefore, even though it used the words "counter offer," was no offer at all; it was instead an invitation for Bourque to make an offer to buy the Property for $130,000. Bourque made that offer when he returned the amended purchase-and-sale agreement to the FDIC. The FDIC never accepted the offer, however, so as a matter of law, no contract was ever formed between the parties. -19- 19 Thus, the defendants are entitled to summary judgment and the district court's decision is AFFIRMED. Costs to appellee. AFFIRMED. Costs to appellee. -20- 20