**NASCO, INC., Plaintiff, Appellant,**

v.

**PUBLIC STORAGE, INC., Defendant, Appellee.**

No. 94–1035.

United States Court of Appeals, First Circuit.

Heard May 3, 1994.

Decided July 18, 1994.

Joseph G. Abromovitz with whom Marsha A. Morello and Abromovitz & Leahy, P.C., Boston, MA, were on brief for appellant.

John P. Connelly with whom James E. Carroll and Peabody & Arnold, Boston, MA, were on brief for appellee.

Before TORRUELLA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

STAHL, Circuit Judge.

In this appeal, plaintiff-appellant NASCO, Inc., challenges the district court's entry of summary judgment against it and in favor of defendant-appellee Public Storage, Inc. ("PSI"). NASCO asserts that the court erred in concluding that a trial was not warranted on its claims for breach of contract and unfair and deceptive trade practices. After conducting a careful review of the record, we agree. We therefore vacate and remand for a trial on the merits.

## I.

### BACKGROUND

#### A. The Facts

In June 1987, NASCO, a closely-held family corporation which had manufactured and distributed springs for mattresses and box springs, ceased business operations. At the time NASCO closed down, it owed Shawmut Bank approximately $800,000.00. NASCO had been having trouble servicing its debt to Shawmut and faced foreclosure. Its only asset of any value was the Chelsea, Massachusetts, facility from which it had operated its business. This facility was estimated to be worth approximately $4,000,000.00.

In early 1988, NASCO retained real estate broker Peter Cooney of Coldwell Banker to act as its agent in marketing the Chelsea facility for sale. Soon after the property went on the market, agents of PSI approached NASCO and expressed an interest in purchasing it for use as a self-storage facility. In April 1988, PSI offered NASCO approximately $3,800,000.00 for the facility, subject to certain terms and conditions. Negotiations ensued and continued for approximately two years. During this period, Shawmut continually threatened foreclosure, but held off because of the apparent seriousness of the negotiations between NASCO and PSI.

Throughout the period of negotiations, other companies, groups, and individuals expressed interest in purchasing the property. PSI's interest, however, appeared significantly more substantial, as PSI representatives (1) repeatedly assured NASCO that PSI would purchase the property as soon as it

acquired a permit allowing the property to be used as a self-storage facility; (2) became personally involved in zoning issues and land court litigation to secure such a permit;[1] and (3) offered to meet with representatives from Shawmut to demonstrate PSI's good faith and interest in acquiring the property. NASCO therefore put all of its energies into finalizing a deal with PSI.

Finally, on January 31, 1990, following a personal review of the property by certain PSI representatives, PSI signed a purchase and sales agreement ("the Agreement") to buy the property for $3,575,000.00.[2] NASCO countersigned the Agreement on February 2, 1990. One paragraph of this Agreement, reproduced below, is particularly relevant to this litigation:

> 11. *Expiration.* This Agreement shall be of no force or effect unless, within seven (7) days after the date this Agreement has been executed by Seller and Buyer's Real Estate Representative, an Officer, the Secretary or Assistant Secretary of Buyer, executes this Agreement on behalf of Buyer and delivers to Seller an executed copy of this Agreement signed on behalf of Buyer by both its Real Estate Representative and either the Secretary or an Assistant Secretary of Buyer, together with the [$20,000.00] Deposit [PSI agreed to provide upon execution of the Agreement].

Importantly, although a PSI Assistant Secretary signed the Agreement and thereafter delivered a copy of it to NASCO, PSI never provided NASCO with the $20,000.00 deposit referenced in paragraph 11.

Subsequent to the signing of the Agreement, the following pertinent events took place. On February 12, 1990, PSI asked NASCO to reactivate electric service to the Chelsea property. NASCO complied with this request. On February 21, 1990, Thomas Bennett, NASCO's attorney, wrote to David Dunn, PSI's attorney, and brought to his attention the fact that PSI had not yet provided NASCO with the $20,000.00 deposit. When Peter Cooney, NASCO's real estate

agent, received a copy of this letter, he contacted PSI representatives, who assured him that the transaction remained viable. These same representatives told him that "the red tape of setting up a development plan" had occasioned the delay in forwarding the deposit. Meanwhile, Attorney Dunn responded to Attorney Bennett's letter by informing him that the deposit "was being worked" on by PSI. Attorney Dunn did not inform Attorney Bennett that the deal was off at this time.

On or about February 22, 1990, PSI generated a mortgage update on the property. On March 2, 1990, PSI prepared a project analysis for the property. On March 19, 1990, Attorney Dunn wrote to Attorney Bennett and informed him that PSI had "decided to terminate" the Agreement. On or about that same date, PSI produced a "Project Abandonment Authorization" which indicated that the Agreement was cancelled as of March 19, 1990, and which noted that no PSI deposits were at risk. Nonetheless, on April 3, 1990, PSI generated a second project analysis.

On April 13, 1990, Shawmut learned that PSI had cancelled the Agreement. Soon thereafter, Shawmut sent NASCO a formal Notice of Intent to Foreclose. On May 23, 1990, Shawmut held a foreclosure sale and itself purchased the property for approximately $852,000.00.

## B. Proceedings Below

On November 9, 1992, NASCO filed a two-count complaint against PSI, alleging that PSI had (1) breached the Agreement; and (2) engaged in unfair and deceptive trade practices in violation of Mass.Gen.L. ch. 93A. The complaint sought more than $8,000,000.00 in damages. Jurisdiction was premised upon diversity of citizenship.

On October 29, 1993, following the close of discovery, PSI filed a motion for summary judgment on both counts of the complaint. With regard to NASCO's breach of contract claim, PSI argued that, under paragraph 11,

---

1. Following the land court litigation, the City of Chelsea granted PSI a use permit on December 28, 1989.

2. NASCO reduced the purchase price from $3,800,000.00 to $3,575,000.00 in order to offset certain expenses incurred by PSI during the two-year negotiation period.

its failure to pay the $20,000.00 deposit within seven days of signing of the Agreement unambiguously had caused the Agreement to "expire by its own terms." In the alternative, PSI asserted that the deposit provision was a condition precedent, and that its failure to pay the deposit had prevented the Agreement from coming into existence. With regard to NASCO's unfair trade practices claim, PSI contended that its conduct, even if objectionable, would not "raise an eyebrow of someone inured to the rough and tumble of the world of commerce," and therefore did not attain "a level of rascality" which could give rise to liability under ch. 93A. *See Levings v. Forbes & Wallace, Inc.*, 8 Mass. App. 498, 396 N.E.2d 149, 153 (1979) (interpreting reach of ch. 93A, § 11, which governs unfair trade practices claims brought by those "engaged in trade or commerce in business transactions with others similarly engaged").

In response, NASCO argued, *inter alia*, that paragraph 11 is ambiguous as to whether PSI's failure to pay the deposit either caused the Agreement to expire or constituted a failure to satisfy a condition precedent, and that extrinsic evidence is admissible to help resolve this ambiguity. It then contended that the extrinsic evidence in this case demonstrates that the Agreement did come into existence and did not expire when PSI did not pay the deposit. NASCO next maintained that this same evidence created a triable issue as to whether PSI's conduct was beyond the toleration of even those persons "inured to the rough and tumble of the world of commerce," *id.*, and precluded summary judgment on its ch. 93A claim. Finally, NASCO asserted that PSI's conduct and its own detrimental reliance on that conduct gave rise to viable claims of estoppel and breach of the implied covenant of good faith and fair dealing, and that these claims, while not explicitly pleaded in its complaint, were

implicit in the allegations underlying its ch. 93A count.

On December 8, 1993, the district court granted PSI's summary judgment motion. With respect to NASCO's breach of contract claim, the court declined to look at NASCO's extrinsic evidence, reasoning that paragraph 11 clearly and unambiguously required payment of the deposit by PSI for the Agreement to have continuing effect.[3] With respect to NASCO's ch. 93A claim, the court stated: "For the same reasons [that NASCO's breach of contract claim fails], Count II of the complaint (the 93A claim), which does not specifically allege any misrepresentations made by PSI, but merely a failure to comply with the Agreement, is also without merit." The court did not explicitly respond to NASCO's contention that its complaint adequately set forth causes of action for estoppel and breach of the implied covenant of good faith and fair dealing. This appeal followed.

## II.

### DISCUSSION

■ NASCO's appellate arguments largely mirror the relevant ones made in its memorandum of law in support of its opposition to PSI's summary judgment motion.[4] NASCO contends that (1) the district court erred in granting PSI summary judgment on its breach of contract claim; (2) the court erred in granting PSI summary judgment on its ch. 93A claim; and (3) the court erred in overlooking the estoppel and breach of the implied warranty of good faith and fair dealing claims that inhered in the allegations in its complaint. After reciting the summary judgment standard, we discuss each argument in turn.

### A. Summary Judgment Standard

■ When presented with a motion for summary judgment, courts should "pierce

---

3. It is not clear from its memorandum of decision whether the court viewed the Agreement as having never been in effect or as having expired seven days after its execution.

4. In its brief, NASCO raises for the first time an alternative argument that the extrinsic evidence proves that, subsequent to concluding the Agreement, the parties modified the deposit provision of paragraph 11. Because NASCO never made

this argument to the district court, we will regard it as waived. *See FDIC v. World Univ. Inc.*, 978 F.2d 10, 13 (1st Cir.1992) (arguments raised for the first time on appeal ordinarily are deemed waived). Of course, if it so desires, NASCO may file a post-remand motion to amend its complaint so as to state an alternative claim for modification.

the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Medicine,* 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1845, 123 L.Ed.2d 470 (1993). A summary judgment motion should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

 "In this context, 'genuine' means that the evidence is such that a reasonable jury *could* resolve the point in favor of the nonmoving party," *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38 (1st Cir.1993) (internal quotation marks and citations omitted) (emphasis supplied), while "material" means that the fact has "the potential to affect the outcome of the suit under the applicable law," *Nereida–Gonzalez v. Tirado–Delgado,* 990 F.2d 701, 703 (1st Cir.1993). One should note, however, that we always read the record "in the light most flattering to the nonmovant and indulg[e] all reasonable inferences in that party's favor." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 581 (1st Cir.1994). Our recitation of the facts in this case, *see supra* section I–A, reflects this tenet.

Finally, our review of a summary judgment ruling is plenary. *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990).

## B. The Breach of Contract Claim

As noted above, the district court granted PSI summary judgment on NASCO's breach of contract claim. In so doing, the court declined to consider any evidence beyond the four corners of the Agreement, ruling that, under "the clear and unambiguous" provisions of paragraph 11, "PSI's failure to pay the deposit made the Agreement without force and effect." NASCO challenges this ruling, arguing that paragraph 11 is ambiguous on the question of whether PSI's failure to pay the deposit somehow precluded the Agreement from taking effect, that extrinsic evidence is admissible to clarify this ambiguity, and that the extrinsic evidence in this case creates a triable issue as to whether PSI's failure to pay the deposit had any bearing on the Agreement's efficacy. We are persuaded by NASCO's argument.

 Under Massachusetts law, "the question of whether a contract term is ambiguous is one of law for the judge." *FDIC v. Singh,* 977 F.2d 18, 22 (1st Cir.1992) (citation omitted). When the judge finds that a contract term is, in some material respect, uncertain or equivocal in meaning, then " 'all the circumstances of the parties leading to its execution may be shown for the purpose of elucidating, but not contradicting or changing its terms.' " *Boston Edison Co. v. F.E.R.C.,* 856 F.2d 361, 365 (1st Cir.1988) (applying Massachusetts law) (quoting *Robert Industries, Inc. v. Spence,* 362 Mass. 751, 291 N.E.2d 407, 409 (1973)); *see also Massachusetts Mun. Wholesale Elec. Co. v. Town of Danvers,* 411 Mass. 39, 577 N.E.2d 283, 289 (1991) (courts consider extrinsic evidence to discern intent of contracting parties when a contract term is ambiguous).

As an initial matter, we do not share the district court's conviction that the intended operation and meaning of paragraph 11's provisions are clear and unambiguous. On the one hand, Paragraph 11 is entitled "Expiration." This suggests that the Agreement would, upon execution, come into and remain in effect unless and until some specified act or omission caused it to cease existing. On the other hand, the text of paragraph 11 states that the Agreement would "be of no force or effect unless," within seven days of its signing by NASCO and PSI's real estate representative, "an Officer, the Secretary or Assistant Secretary of [PSI] executes this Agreement . . . and delivers to Seller an executed copy of this Agreement signed on behalf of Buyer by both its Real Estate Representative and either the Secretary or an Assistant Secretary of Buyer, together with the Deposit." This suggests that the Agreement would not come into effect at all unless and until some certain condition or conditions precedent had transpired. Thus, even if PSI is correct in asserting that the viability of the Agreement depended upon its payment of the deposit, it is not at all clear

whether the Agreement ever went into effect.[5]

Of course, if payment of the deposit by PSI were, under either of PSI's theories, *see supra* note 5, a requirement for the Agreement to be in effect beyond the seven-day window set forth in paragraph 11, then the ambiguity on the question of whether the Agreement had ever come into effect would be immaterial. In our view, however, paragraph 11 does not clearly and unambiguously make payment of the deposit within the seven-day window such a requirement. We do think that one plausibly can read paragraph 11 as mandating that the deposit be delivered "together with" a copy of the executed Agreement for the Agreement to be viable. Nonetheless, we think it at least as plausible to view the delivery of a signed copy of the Agreement *itself* as the viability-triggering act, and to construe the deposit provision as merely confirming an earlier provision[6] which provided that PSI *would* deliver the $20,000.00 *when* it delivered to NASCO a copy of the fully executed Agreement. Therefore, we are of the opinion that the deposit provision is ambiguous. *See Singh,* 977 F.2d at 22 ("[C]ontract language which is susceptible to differing, but nonetheless plausible constructions is ambiguous.") (citation and ellipsis omitted). This ruling finds support in the fact that, under an extremely strict and literal reading of paragraph 11, PSI's undisputed delivery of a copy of the fully executed Agreement without the deposit would have been meaningless.[7]

Having determined that the relevant provisions of paragraph 11 are ambiguous, we turn now to the parties' extrinsic evidence. And, we believe it apparent that this evidence undermines the district court's ruling that, as a matter of law, "PSI's failure to pay the Deposit made the Agreement with-

out force and effect." We think a reasonable jury could conclude, on the basis of the evidence regarding the parties' actions subsequent to the February 9, 1990 expiration of the seven-day window provided for in paragraph 11, that the parties did not intend payment of the deposit to be a *sine qua non* for the Agreement to be viable beyond this date. This evidence includes, but is not limited to, (1) PSI's February 12, 1990 request that NASCO reactivate electric service to the Chelsea property; (2) PSI's assurances to NASCO's real estate representative, made in late February 1990, that the transaction would go through and that the delay in paying the deposit was due to "the red tape of setting up a development plan"; (3) PSI's attorney's representation to NASCO's attorney, made in late February 1990, that the deposit "was being worked on"; and (4) the mortgage update and project analyses involving the property prepared by PSI between February 22, 1990 and April 3, 1990.

Accordingly, we vacate the district court's entry of summary judgment against NASCO on its breach of contract claim, and remand for a trial on the merits.

### C. The ch. 93A Claim

As noted above, the district court premised its entry of summary judgment against NASCO on the ch. 93A claim on its conclusion that PSI did not breach the Agreement. Because the court erred in reaching this conclusion at the summary judgment stage, we cannot rely upon its reasoning to affirm the summary judgment ruling on the ch. 93A claim.

PSI nonetheless argues, as it did before the district court, that we should affirm the entry of summary judgment in its favor on NASCO's ch. 93A claim because (1) the claim

---

5. PSI's alternative arguments that the Agreement (1) expired by its own terms; or (2) never came into existence underscore this point.

6. Paragraph 3 of the Agreement states: "Of the [full $350,000.00] deposit referenced in paragraph 1.(a) hereof, $20,000.00 *shall be paid upon execution hereof....*" (Emphasis supplied).

7. One should note that PSI does not argue that the deposit had to be paid *at the very same time*

as its delivery of a signed copy of the Agreement to NASCO. Instead, PSI contends that paragraph 11 clearly and unambiguously called for payment of the deposit at some point within the seven-day window. A highly-literal reading of paragraph 11 (the only type of reading that could entitle PSI to summary judgment), however, cannot support this argument; the Agreement called for the deposit to be paid "together with" the delivery of an executed copy of the Agreement.

is governed by ch. 93A, § 11; and (2) ch. 93A, § 11 requires that objectionable conduct reach "a level of rascality" not present here. More particularly, PSI contends that, in a breach of contract situation, liability does not attach under ch. 93A, § 11 unless a defendant knowingly breached a contract in order to secure additional benefits to itself to the detriment of a plaintiff. *See Atkinson v. Rosenthal,* 33 Mass.App. 219, 598 N.E.2d 666, 670 (1992) ("There is in those decisions [imposing liability under ch. 93A, § 11] a consistent pattern of the use of a breach of contract as a lever to obtain advantage for the party committing the breach in relation to the other party; i.e., the breach of contract has an extortionate quality that gives it the rancid element of unfairness. In the absence of conduct having that quality, a failure to perform obligations [under a contract], even though deliberate and for reasons of self-interest, does not present an occasion for invocation of ch. 93A remedies.") (citation omitted).

■ The difficulty with PSI's argument is that, even if we credit all of its premises, we believe that a reasonable jury could conclude from the evidence in this case that PSI breached the Agreement in order to obtain for itself unbargained-for benefits to the detriment of NASCO. Four facts in particular inform this decision. First, as we stated in the preceding section of this opinion, a reasonable jury could find that, irrespective of whether or not PSI paid the $20,000.00 deposit, the Agreement became viable and enforceable when PSI's Assistant Secretary signed it and delivered it to NASCO. Second, a reasonable jury could conclude that PSI was contractually obligated to hand over the $20,000.00 deposit at the same time it delivered to NASCO a copy of the fully executed Agreement. Third, a reasonable jury could find that NASCO desperately needed the Agreement to go forward in order to extricate itself from its dire financial straits. And fourth, a reasonable jury could find that

PSI was fully cognizant of NASCO's desperate financial situation. On the basis of these facts, and others noted above, we think that a reasonable jury could infer that PSI (1) signed the Agreement in order to obligate NASCO to deliver the property to it for $3,575,000.00, if PSI so chose;[8] (2) intentionally breached its obligation to pay the $20,000.00 deposit, knowing full well that NASCO was in no position to repudiate the Agreement on the basis of PSI's non-payment of the deposit; (3) used the period of time after the signing of the Agreement to investigate the property further and to determine whether it should honor the Agreement; and (4) then used its wrongful non-payment of the deposit in order to avoid its obligations under the Agreement. In other words, we believe that a reasonable jury could find that PSI manipulated the situation so as to create for itself, *at no cost,* both a fully enforceable option to buy the property and a textual basis for repudiating the agreement at its discretion. This was more than PSI bargained for; moreover, it deprived NASCO, at the least, of $20,000.00 to which NASCO was contractually entitled.[9]

Accordingly, we vacate the district court's entry of summary judgment on NASCO's ch. 93A claim, and remand for a trial on the merits.

### D. The Pleading Issue

Finally, NASCO asserts that the district court erred in failing to infer from the allegations underlying its ch. 93A claim independent claims of estoppel and breach of the implied warranty of good faith and fair dealing. The issue is a close one. On the one hand, it is impossible to fault the district court for taking NASCO's complaint, which makes absolutely no mention of either estoppel or any implied warranties, at face value. On the other hand, we have construed Fed. R.Civ.P. 8 to allow recovery under an unpleaded legal theory so long as related legal

---

8. In so stating, we note paragraph 7(b) of the Agreement: "If Seller shall fail to consummate this Agreement for any reason except Buyer's default, Buyer may, in addition to any other remedy, enforce specific performance of the terms of this Agreement."

9. Paragraph 7(c) of the Agreement provides: "If Buyer shall fail to consummate this Agreement for any reason except Seller's default, then Seller *shall be entitled* to retain the deposit paid hereunder...."

theories and essential allegations have been pleaded. *See Connecticut Gen. Life Ins. Co. v. Universal Ins. Co.*, 838 F.2d 612, 622 (1st Cir.1988).

It is, however, unnecessary for us to reach this question at this time. After remand, NASCO will have ample opportunity to file a Fed.R.Civ.P. 15(a) motion to amend its complaint so as to state explicitly claims of estoppel and breach of the implied warranty of good faith and fair dealing. And, if NASCO is correct in arguing that allegations already made and evidence already obtained in this case are sufficient to support these claims, we are confident that its motion will be granted. *See Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962) (where there is no compelling reason for disallowing an amendment, Rule 15(a)'s admonition that leave to amend shall be "freely given" is to be heeded).

### III.

### CONCLUSION

For the reasons stated above, we vacate the district court's entry of summary judgment in favor of PSI on NASCO's claims for breach of contract and unfair and deceptive trade practices, and remand this matter for a trial on the merits.

*Vacated and remanded.*