United States Court of Appeals United States Court of Appeals
For the First Circuit For the First Circuit



No. 97-1340
NASCO, INC.,

Plaintiff, Appellant,

v.

PUBLIC STORAGE, INC.,

Defendant, Appellee.



No. 97-1457
PUBLIC STORAGE, INC.,

Defendant, Cross-Appellant,

v.

NASCO, INC.,

Plaintiff, Cross-Appellee.



APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Reginald C. Lindsay, U.S. District Judge] 


Before

Torruella, Chief Judge, 
Lynch, Circuit Judge, 
and Keeton,* District Judge. 



Joseph G. Abromovitz, with whom John G. Balzer and 

 

* Of the District of Massachusetts, sitting by designation.

Abromovitz & Leahy, P.C., were on brief, for plaintiff- 
appellant NASCO, Inc.
James E. Carroll, with whom Kristen M. Lacovara and 
Cetrulo & Capone were on brief, for defendant-appellee Public 
Storage, Inc.


October 8, 1997


-2- 2

LYNCH, Circuit Judge. One novel issue under Mass. LYNCH, Circuit Judge. 

Gen. Laws ch. 93A is presented by this appeal: May a chapter

93A 11 claimant be awarded attorney's fees where the only

"adverse effects" it suffers from the violation are the

incurring of valid bills which it does not pay because it is

unable to do so? We answer this question in the affirmative

in light of Massachusetts precedent and the policy behind the

attorney's fees provisions of chapter 93A.

NASCO, Inc., a family business in financial

trouble, attempted to sell its principal asset, an old brick

warehouse in Chelsea, Massachusetts. Lengthy negotiations

with Public Storage Inc. ("PSI"), a California-based company,

produced a purchase and sale agreement in February of 1990

which NASCO thought constituted an effective contract for the

sale of the building, but which a jury did not. Both the

trial judge and the jury (in an advisory capacity) thought

that PSI nonetheless had engaged in unfair and deceptive

business practices in the course of its dealings, although

the judge found so for only a limited period of time.

PSI escaped an award of significant damages against

it when the judge found that, while NASCO had suffered harm

during this limited period, NASCO had not shown monetary

damages. The judge did award NASCO attorney's fees and costs

on that basis. But the award was only a fraction of what

NASCO had sought, because NASCO had failed to document the

-3- 3

fees for its successful claim under chapter 93A separately

from the fees for its unsuccessful contract claim. Conceding

the jury verdict on the contract claim, NASCO appeals, saying

that the evidence showed that PSI violated chapter 93A for a

longer period, that NASCO suffered damages of at least

$700,000, and that it should have received more in attorney's

fees. PSI also appeals, arguing that the evidence does not

show any violation of chapter 93A at all. We affirm.

I.

NASCO, Inc. manufactured bedding products at a

factory located in a large brick building in Chelsea.

NASCO's financial difficulties convinced the owners by early

1987 to wind down the business by selling off the assets,

paying creditors, and distributing the remainder to the

shareholders. NASCO's principal asset was the Chelsea

property, which an appraiser then valued at $4 million. The

property was subject to a $40,000 first mortgage held by the

Small Business Administration and to an $800,000 second

mortgage held by Shawmut Bank.

NASCO's property interested Public Storage, Inc., a

corporation that operates self-storage facilities throughout

the United States. In February 1987, NASCO and PSI executed

a purchase and sale agreement for the property, reciting a

price of $3.6 million. The parties terminated that agreement

by mutual consent after learning that Chelsea's zoning laws

-4- 4

did not permit the use of the property as a mini-warehouse.

PSI remained interested in the project, and pursued relief

from the zoning restriction at its own expense, both in

administrative appeals and ultimately in the courts.

During this time, NASCO actively sought other

buyers for the property while continuing negotiations with

PSI. In September 1988, Cambridge Investment Group offered

$4 million. In February 1989, Rauseo & Co. offered $3.4

million. PSI was kept informed of the offers. PSI continued

to express its interest in the property, contingent on a

favorable outcome of its zoning litigation, and offered to

increase its offering price to $3.8 million. Neither of the

other offers resulted in a sale.

Throughout this period, NASCO had difficulty making

its payments on the Shawmut loan. By the summer of 1989,

shareholders had loaned the corporation a total of $268,000

in personal funds and could no longer afford to keep current

on the loan payments. Anticipating a favorable outcome in

the pending land court litigation, PSI representatives

persuaded Shawmut not to foreclose on the property.

In November 1989, the land court ruled in favor of

PSI on the zoning issue. NASCO and PSI began exchanging

drafts of a second purchase and sale agreement (the "1990

P&S"). On January 31, 1990, all necessary PSI

representatives signed the new agreement; on February 2,

-5- 5

1990, NASCO representatives counter-signed. The agreement

contained an "expiration clause" which PSI had demanded and

which the parties had negotiated. The clause provided:

11. Expiration. This Agreement shall be of no 
force or effect unless, within seven (7) days
after the date this Agreement has been
executed by Seller and Buyer's Real Estate
Representative, an Officer, the Secretary or
Assistant Secretary of Buyer, executes this
Agreement on behalf of Buyer and delivers to
Seller an executed copy of this Agreement
signed on behalf of Buyer by both its Real
Estate Representative and either the Secretary
or an Assistant Secretary of Buyer, together
with the Deposit.

Both PSI's local real estate representative and its secretary

had signed the 1990 P&S on January 31, but PSI never paid the

required deposit.

Between early February 1990 and March 19, 1990,

NASCO inquired about the deposit several times, both orally

and by letter. PSI did not respond by stating that the 1990

P&S had expired because the deposit had not been paid, but

instead claimed that the funds were tied up in its own

internal bureaucracy. The trial judge found that in other

respects PSI continued to act as though it still intended to

purchase the property under the agreement. Specifically, PSI

employees requested access to the facility and asked NASCO to

restore electrical power. However, in the meantime PSI

continued refining its own economic forecasts of the

viability of the Chelsea property as a self-storage

warehouse. PSI's statistical analysis indicated that the

-6- 6

project would only be viable at a price between $1 million

and $2 million lower than the 1990 P&S provided. PSI decided

to abandon the project. On March 19, 1990, PSI informed

NASCO, by letter, that PSI had "decided to terminate" the

1990 P&S. The letter did not refer to the expiration clause.

NASCO informed its bank that the deal with PSI had

evaporated, and within two months the property was sold at a

foreclosure sale for $852,000.

II.

NASCO sued PSI for breach of contract and violation

of chapter 93A. The district court initially granted PSI's

summary judgment motion on both counts, reasoning that the

expiration clause was unambiguous, requiring the payment of

the deposit to bind PSI, and that NASCO could not establish a

violation of chapter 93A in the absence of an enforceable

agreement. This Court reversed, finding the expiration

clause ambiguous, and remanded for trial. See NASCO, Inc. v. 

Public Storage, Inc. (NASCO I), 29 F.3d 28 (1st Cir. 1994).  

The case was tried before a different judge. NASCO

amended its complaint to add claims for breach of the implied

covenant of good faith and fair dealing and for estoppel.

Before trial, PSI changed its legal theory, admitting the

existence of a contract prior to the expiration of the seven-

day period, and the parties dismissed the estoppel claim.

Following a fourteen-day trial, a jury ruled for the

-7- 7

defendant on the contract claim and on the implied covenant

of good faith claim. Serving as an advisory jury only, the

jury answered interrogatories finding in favor of NASCO on

the chapter 93A claim, and recommended damages of $700,000.

Judge Lindsay, not accepting the advisory jury's findings,

ruled that there was no violation of chapter 93A prior to the

execution of the 1990 P&S on February 2 because the parties

did not consider the sale to be a "firm deal" until that

document was signed.

The district court did find that PSI had violated

chapter 93A through its deceptive conduct following the

expiration of the 1990 P&S in an attempt to keep its options

open, but ruled originally that NASCO had not been damaged

thereby. The district court amended its judgment to reflect

"adverse effects" from PSI's deceptive conduct.

Specifically, it found that PSI's conduct led NASCO to incur

additional legal expenses and the expense of restoring

electricity to the facility following the expiration of the

contract. The district court ruled that NASCO had not proven

the amount of these damages and so could not recover them,

but that the existence of these "adverse effects" entitled

NASCO to an award of attorney's fees for the chapter 93A

claim only. The district court awarded $35,000 in attorney's

fees and $4,097 in costs, one-fifth of what NASCO requested,

after discounting the portion of plaintiff's fee request that

-8- 8

it considered related to the unsuccessful contract claim.

III.

Both sides appeal. NASCO does not challenge the

jury's finding on the contract and implied covenant of good

faith claims, but rather appeals the judge's finding that

PSI's conduct prior to February 2, 1990 did not violate

chapter 93A. NASCO argues that the judge's finding goes

against the weight of the evidence and disregards the

advisory jury's findings. NASCO also claims the amount of

the attorney's fees awarded was "arbitrary and capricious."

PSI challenges the judge's finding of a chapter 93A

violation, claiming it is against the weight of the evidence,

and challenges the judge's finding of "adverse effects"

supporting the attorney's fee award. PSI does not challenge

the amount of attorney's fees awarded.

IV.

The Chapter 93A Violation 

When this case was previously before this court, we

reversed summary judgment for defendant on both the contract

and the chapter 93A claim. As to the chapter 93A claim, we

noted that the evidence could be read to infer that PSI:

(1) signed the Agreement in order to
obligate NASCO to deliver the property to
it for $3,575,000.00, if PSI so chose;

(2) intentionally breached its obligation
to pay the $20,000.00 deposit, knowing
full well that NASCO was in no position
to repudiate the Agreement on the basis

-9- 9

of PSI's non-payment of the deposit; 

(3) used the period of time after the
signing of the Agreement to investigate
the property further and to determine
whether it should honor the Agreement;
and 
(4) then used its wrongful non-payment of
the deposit in order to avoid its
obligations under the Agreement.

NASCO I, 29 F.3d at 34 (footnote omitted). That evidence and 

more was introduced at trial.

We review basic chapter 93A law. A party is not

exonerated from chapter 93A liability because there has been

no breach of contract. The law of Massachusetts has been

clear on this point since at least the decision of the

Supreme Judicial Court in Jet Line Services, Inc. v. American 

Employers Ins. Co., 537 N.E.2d 107 (Mass. 1989). The court 

in Jet Line held that there was no coverage under the 

contract of insurance between plaintiff and defendant.

Nonetheless, the conduct of the insurance company in leading

the insured to believe there was coverage constituted an

unfair and deceptive trade practice. Accord Massachusetts 

Farm Bureau Federation, Inc. v. Blue Cross of Massachusetts, 

Inc., 532 N.E.2d 660, 664 (Mass. 1989)(violation of chapter 

93A 11 need not be premised on a violation of an

independent common law or statutory duty). The fact that the

jury found no breach of contract does not preclude NASCO's

chapter 93A claim.

While the rubric of "rascality" as the test of

-10- 10

whether something is "unfair or deceptive" has been oft-

recited, both the Supreme Judicial Court and this court have

noted that such rhetoric is "uninstructive." See Cambridge 

Plating Co., Inc. v. Napco, Inc., 85 F.3d 752, 768 (1st Cir. 

1996); Massachusetts Employees Ins. Exch. v. Propac-Mass, 

Inc., 648 N.E.2d 435, 438 (Mass. 1995). We apply the 

standards of Propac and Jet Line and easily hold that the 

evidence was not so overwhelming as to require the trial

court to find that PSI acted in an unfair or deceptive manner

before February 2, 1990.

The evidence adequately supports the trial judge's

conclusion that before February 2, 1990 NASCO was aware that,

in the absence of a signed P&S with PSI, it could not be

assured of a sale of the Chelsea property. Thus, under

Pappas Indus. Parks, Inc. v. Psarros, 511 N.E.2d 621, 623 

(Mass. App. Ct. 1987), the judge could readily conclude that

it was not reasonable for NASCO to rely on PSI's

representations before February 2. While the judge could

have reached the opposite conclusion, as did the advisory

jury, he was not required to do so.1

PSI in turn argues that there was no violation of

chapter 93A after February 2, 1990. In Propac, 648 N.E.2d at 

438, the Supreme Judicial Court directed that the focus be on

 

1. The advisory jury's opinion does not bind the court. See 
Wyler v. Bonnell Motors, Inc., 624 N.E.2d 116, 118-19 (Mass. 
App. 1993).

-11- 11

"the nature of the challenged conduct and on the purpose and

effect of the conduct." As in Propac, the defendant here 

continued to act as though a legal relationship were in place

when it was not and the conduct was unilateral and self-

serving. In both cases, some harm was also done to third

parties -- in this instance, the closing attorney and the

electric company. In each instance, the plaintiff was

particularly vulnerable and the defendant's unfair conduct

gave it greater leverage.

The record also easily supports the trial judge's

findings that after February 2, 1990 NASCO believed it had a

firm deal with PSI and that such a belief was reasonable and

induced by PSI's actions. Cf. Greenstein v. Flatley, 474 

N.E.2d 1130 (Mass. App. Ct. 1985). As the trial judge found:

PSI used the period between February 2,
1990 and March 19, 1990 to complete its
assessment of the economic soundness of
the purchase of the Chelsea Property. To
keep all of its options open, PSI
unfairly and deceptively led NASCO to
believe that the parties had entered into
a binding agreement and the deposit was
delayed merely because of administrative
inefficiencies. All the while, PSI
actually withheld the deposit because it
reasoned that the failure to pay the
deposit would permit PSI to repudiate the
agreement if, after review, the purchase
of the Chelsea Property seemed not be an
economically advantageous transaction.
Thus when PSI determined that the
purchase was indeed economically unsound,
it instructed its lawyer to advise NASCO
that the deal was off.

During February and March, NASCO's attorney and

-12- 12

broker made several inquiries concerning the late deposit.

They testified that PSI reassured them that the delays were

simply the result of PSI's bureaucratic procedures, and that

PSI never indicated that the contract had expired. It was

only after the filing of NASCO's lawsuit that PSI claimed the

contract had expired because of the unpaid deposit.

Attorney's Fees 

The more difficult question is whether NASCO

suffered any adverse effects sufficient to trigger liability

for attorney's fees under chapter 93A. In Jet Line, the 

court held that "Under 11, a plaintiff must be entitled to

relief in some other respect in order to be entitled to an

award of attorneys' fees. . . . Under 11, [the] unfair or

deceptive conduct must have had some adverse effect upon the

plaintiff, even if it is not quantifiable in dollars." Jet 

Line, 537 N.E.2d at 115. Because this is a 11 business 

case, and not a 9 consumer case, the Jet Line rule applies. 

The trial judge found that NASCO had not shown that

there were any other potential buyers for the building in

this February/March 1990 time frame, so NASCO could not claim

the sale value of the building as damages. The district

court found two elements of damage: NASCO, believing it had a

contract, incurred legal fees in anticipation of a closing,

and NASCO suffered losses in the form of the costs associated

with restoring power to the Chelsea property at the request

-13- 13

of PSI. Such effects would indeed meet the Jet Line 

requirement of "adverse effects." See also Star Financial 

Services, Inc. v. AA Star Mortgage Corp., 89 F.3d 5, 15 (1st 

Cir. 1996) (award of injunctive relief based on demonstrated

risk of future actual loss constitutes an unquantifiable

"adverse effect" under Jet Line); Jillian's Billiard Club of 

America, Inc. v. Beloff Billiards, Inc., 619 N.E.2d 635, 638 

(Mass. App. Ct. 1993) (where no damages awarded, value of

what was taken or start up costs, which might have been

quantifiable, are sufficient to support award of attorney's

fees).

PSI argues that the record does not support these

conclusions for two reasons. First, while NASCO incurred

legal fees for work by counsel in anticipation of a closing,

there is no evidence that it ever paid those bills, and is

not now obligated to pay as any claim for legal services is

barred by the statute of limitations. Second, NASCO did not

reactivate electricity at PSI's request during the Chapter

93A violation period and it did not pay for the electric

expenses because it took the position that PSI was

responsible to pay those costs and because NASCO had no money

to pay these bills.

The record shows that Peter Cooney, NASCO's broker

for the property, was contacted by Kevin Kinneavy of PSI, who

requested that power be restored to the property. In

-14- 14

response, NASCO's attorney, Thomas Bennet, sent a letter

dated February 12, 1990 to Boston Edison requesting that

power be restored to the property. Mr. Bennet sent copy of

this letter to Mr. Kinneavy. Witnesses testified that power

was subsequently restored to the property, and Harvey

Shapiro, NASCO's vice president, testified that Boston Edison

billed NASCO after February of 1990, but that these bills

were not paid. Attorney Bennet's billing records, which

listed several entries connected with the sale of the Chelsea

property between February 2 and March 19, 1990, were also in

evidence.

In light of this evidence that NASCO incurred both

legal and electrical bills and the trial judge's implicit

finding that the bills were in fact incurred, PSI's argument

evolves to a contention that because NASCO did not pay these

bills, it has suffered no "adverse effects" under Jet Line 

and is not entitled to damages. NASCO's failure to pay the

bills means that it did not recover damages for those

liabilities, but it does not mean that NASCO did not suffer

adverse effects. To the extent that PSI's objection is that

the bills were not valid or the debts were not validly owed,

the trial judge implicitly found against PSI. It would, of

course, be a different matter if the bills were inflated or

fictitious. To the extent that PSI's objection is that there

were valid debts, but NASCO did not pay them, the decision of

-15- 15

the Supreme Judicial Court in DiMarzo v. American Mut. Ins. 

Co., 449 N.E.2d 1189 (Mass. 1983) is instructive. Although 

DiMarzo dealt with a judgment and not a mere bill, the 

Supreme Judicial Court held that entry of a judgment

constitutes a loss of money for purposes of chapter 93A. In

addition, DiMarzo said, "[t]he loss does not turn on whether 

the judgment has been satisfied." Id. at 1196. While a 

judgment is admittedly different than a bill, that a valid

debt (evidenced by a bill) has not been paid does not mean

that there has been no adverse effect.

PSI's unfair and deceptive practices caused NASCO

to incur these legal and electrical bills. This worsened

NASCO's financial position and put it at risk of suit on

these bills. PSI should not avoid attorney's fees for its

behavior because NASCO could not pay bills it would not have

incurred had PSI not violated the law. Indeed, PSI's

position seems contrary to the intent of chapter 93A.

Vulnerable, struggling companies in bad bargaining positions

are more likely to need the protection of chapter 93A than

robust, successful companies. If we adopt PSI's position,

impecunious businesses, unable to pay their bills and trying

to sell their assets in order to do so, would be placed on a

different footing under chapter 93A than more solvent

plaintiffs. The purpose of the chapter 93A 11 attorney's

fees provision is to deter businesses from engaging in unfair

-16- 16

and deceptive trade practices where those practices have

adverse effects. See Commonwealth v. Fall River Motor Sales, 

Inc., 565 N.E.2d 1205, 1214 (Mass. 1991); Manning v. 

Zuckerman, 444 N.E.2d 1262, 1266 (Mass. 1983) ("Through the 

imposition of penalties for specific unfair or deceptive acts

or practices between particular individuals, the statute

seeks to deter these practices and to reduce the general

danger to the public arising from the potential for such

unscrupulous behavior in the marketplace."). We conclude

that NASCO was eligible for an award of attorney's fees. 

NASCO argues that the district court's fee award

was too small. But Jet Line, 537 N.E.2d at 114-15, holds 

that an attorney's fees award should be adjusted to eliminate

any award for legal services rendered in connection with

unsuccessful claims. The district court acted well within

its discretion when it decided to award NASCO only part of

the attorney's fees and costs NASCO had incurred in the

course of this litigation. See DiMarzo, 449 N.E.2d at 1202 

("The amount of reasonable attorney's fees under c.93A is

within the broad discretion of the trial judge."); Linthicum 

v. Archambault, 398 N.E.2d 482, 488 (Mass. 1979), overruled 

in part on other grounds by Knapp Shoes, Inc. v. Sylvania 

Shoe Mfg. Corp., 640 N.E.2d 1101, 1105 (Mass. 1994). 

V.

To conclude, we hold that the district court

-17- 17

correctly applied the law of chapter 93A to this case. The

record clearly supports the district court's finding that

PSI's actions from February 2 to March 19 of 1990 violated

chapter 93A's prohibition of unfair and deceptive trade

practices. The district court was also correct to conclude

that NASCO suffered adverse effects during this period for

which attorney's fees could be awarded. The judgment of the

district court is therefore affirmed. Costs are awarded to 

NASCO.

-18- 18