Gerald ALBERTINI, Plaintiff,

v.

SUMMIT TECHNICAL SERVICES, INC., Defendant.

No. CIV.A. 02–40117–CBS.

United States District Court, D. Massachusetts.

Oct. 15, 2003.

William D. Jalkut, Fletcher, Tilton & Whipple, Worcester, MA, for Gerald Albertini, Plaintiff.

Stacie B. Collier, Nixon Peabody, LLP, Andrew B. Prescott, Nixon Peabody, LLP, Providence, RI, for Summit Technical Services Inc., Defendant.

## MEMORANDUM OF DECISION AND ORDER FOR JUDGMENT

SWARTWOOD, United States Magistrate Judge.

### Background

On January 30, 2003, this case was referred to me in accordance with the provisions of 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73 for all further proceedings, including trial, order for entry of a final judgment and post-judgment proceedings.

### Nature Of The Case

This is a jury waived contract action in which Plaintiff, Gerald Albertini ("Plaintiff" or "Mr. Albertini"), seeks a termination payment under a letter of understanding between he and Summit Technical Services ("Defendant" or "Summit"), see Pl's Ex. 1 ("Letter Agreement"), which provided for such payment if Mr. Albertini's employment was terminated by Summit "without cause after the . . . restructuring of Summit by the current partners."[1] Summit acknowledges that Mr. Albertini's employment was terminated without cause, but disputes that he was terminated as the result of a "restructuring" of the company. Additionally, Summit contends that even if there was a "restructuring" of the company within the meaning of the Letter Agreement, Mr. Albertini is barred from recovering any termination payment thereunder as the result of his own material breach of Article 5 of an Employment Agreement, dated February 16, 2001, between he and Summit. See Pl's Ex. 2 ("Employment Agreement").

### Statement Of Agreed Facts

1. Summit recruited Mr. Albertini to become its new Chief Operating Officer ("COO");

2. Summit had created the COO position and three new positions of Division Manager as part of a revised management model in late 2000 and early 2001;

3. Four new positions were designed to relieve members of the Board of Directors of their daily responsibilities in managing the business;

4. Mr. Albertini assumed the duties formally exercised by Richard Barry who was President, member of the Board of Directors and a shareholder of Summit;

5. Mr. Albertini and Summit signed the Letter Agreement and the Employment Agreement[2];

---

1. The Letter Agreement also provided that Mr. Albertini would be entitled to a termination payment if his employment was terminated in connection with the "sale" of the company. The parties agree that Mr. Albertini was not terminated in connection with a sale of Summit.

2. The Employment Agreement provides that "This Agreement represents the Entire Employment Agreement between the parties and supercedes any and all prior Agreements or understandings, oral or written, between EMPLOYEE and SUMMIT pertaining to the subject matter covered by this Agreement. . . ." Employment Agreement, at Article 9. Summit does not contend that the Employment Agreement and Letter Agreement are not an integrated contract and therefore, I will treat them as such. In any event, under the circumstances of this case, any such argument would likely be futile as it is likely that under

6. Mr. Albertini's employment with Summit was terminated without cause on March 22, 2002;

7. Upon Mr. Albertini's termination, Mr. Barry resumed the duties that had been delegated to Mr. Albertini; and

8. Mr. Albertini's damages are determined by the offer letter and cannot exceed $84,615.20.

*Jt. Pre–Trial Mem.* (Docket No. 27) ("*Jt.Mem*"), at pp. 3, 4.

*Summit's Motion To Amend Its Answer; Whether Mr. Albertini Materially Breached The Employment Agreement.*

### Summit's Motion to Amend

This case was tried on August 26, 2003. On August 25, 2003, Summit filed a Motion To Amend The Answer (Docket No. 25), in which it sought to add the following two additional, related affirmative defenses:

6. Plaintiff's material breach of the parties' agreement excuses Summit's performance.

7. The Plaintiff has forfeited his right to any exit or severance payment because he violated Article 5 of the Employment Agreement.

*See* proposed Defendant's First Amended Answer attached to *Def's Mot. To Amend The Answer* (Docket No. 25). Plaintiff objected to Summit's motion to amend its Answer, filed just prior to the start of trial, on the grounds of prejudice and undue delay.

A defendant may amend its answer with leave of court "and leave shall be freely given when justice so requires". Fed.R.Civ.P. 15(a). Generally, leave to amend will be given unless such amendment would be futile, would be prejudicial to the opposing party, or was the result of "undue or intended delay". *Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st

Cir.1994). Summit argues that it did not unduly delay in filing this motion because it was unnecessary to have pled the disputed contentions (*i.e.*, that as a result of his having materially breached Article 5 of the Employment agreement, either Mr. Albertini forfeited his right to a termination payment, or Summit was excused from making such payment) as affirmative defenses and it sought to do so on the eve of trial, in an abundance of caution, only because Mr. Albertini was taking the position that Summit's contentions constituted affirmative defenses and Summit's failure to have pled them as such constituted a waiver of those defenses. In the alternative, Summit argues that it was not necessary to have asserted the proposed additional affirmative defenses in its original Answer because they fall within one of the affirmative defenses it did plead, *i.e.*, the doctrine of unclean hands. For purposes of this Order, I will assume that Summit should have plead as affirmative defenses that Mr. Albertini's alleged breach of his Employment Agreement constituted a forfeiture and/or excused Summit's performance under the Letter Agreement. However, under the circumstances, I do not find that Summit unduly delayed in seeking to assert the proposed affirmative defenses, nor do I find that allowing Summit to pursue such affirmative defenses would be futile. I will now address whether Mr. Albertini would be prejudiced if Summit's motion to amend its Answer is allowed.

I informed the parties at the start of the trial that I would reserve ruling on this motion until the close of evidence and instructed the parties to present all evidence that they deemed relevant to Summit's proposed affirmative defenses. It is clear from the testimony presented at trial, both from live witnesses and through deposi-

Massachusetts law, the two documents must be construed together.

tion, that from the beginning of this case, Summit took the position that even if Mr. Albertini were entitled to a termination payment, he either forfeited his right to such payment under Article 5 of his Employment Agreement by materially breaching that agreement, or that Summit was excused from paying him because of such breach. Therefore, these affirmative defenses were not a surprise to Mr. Albertini, who had adequate time before and during the trial to address Summit's contentions that he was precluded from recovery in this action as a result of his own material breach of the Employment Agreement.

For the reasons set forth above, I have allowed Summit's motion to amend its Answer and the Clerk is instructed to docket the Defendant's First Amended Answer.

*Whether Mr. Albertini Materially Breached the Employment Agreement*

■ Article 5 of Mr. Albertini's Employment Agreement with Summit provides as follows:

> EMPLOYEE agrees upon the termination of his/her employment with SUMMIT for any reason whatsoever to return to an officer of SUMMIT all records, papers, documents, data and all other property in his/her possession or control either belonging to the company, used in its business or containing confidential information or pertaining to transactions handled by EMPLOYEE while associated with SUMMIT. He/she will not remove any papers, documents, data or records of any kind, or any copies or reproductions thereof. In the event EMPLOYEE shall fail to so

return all records and related documentation, or in the event [sic.] EMPLOYEE shall forfeit all claims to unpaid compensation without affecting the right of SUMMIT to compel the return of said records and papers.

*Employment Agreement.*[3] Summit asserts that regardless of whether there was a "restructuring" of the company at the time of his termination, Mr. Albertini is barred from recovering any amounts which may be due him under the Letter Agreement because upon his termination, he materially breached this provision by failing to return to Summit confidential records, papers, documents and the like. Summit further contends that Mr. Albertini breached this provision when, after learning of his termination, he asked a fellow employee to download information for him from a company computer onto a compact disk which he took with him. Mr. Albertini, on the other hand, contends that he did not breach Article 5 of his Employment Agreement first, because he did not improperly remove any confidential materials from Summit and second, as to any Summit documents and other materials that he did remove, he promptly returned the same to Summit.

When Mr. Albertini commenced his employment with Summit, as its COO, he lived in Holden, Massachusetts and commuted to Summit's office in Warwick, Rhode Island. During employment negotiations between Summit and Mr. Albertini, Summit abandoned its initial requirement that Mr. Albertini move to Rhode Island and instead, Mr. Albertini continued to commute from Holden.[4] Because of the

---

**3.** It appears that when Article 5 was drafted, certain words were inadvertently omitted. As drafted, Article 5 subjects Mr. Albertini to forfeiture of any payments due him under the Letter Agreement only if he fails to return any Summit documents to it. Mr. Albertini does

not forfeit payments due him as the result of his having removed the documents and other materials from Summit.

**4.** Summit then paid Mr. Albertini "a signing bonus of $15,000 in order to compensate

lengthy commute, Mr. Albertini often brought work home with him which he attended to on evenings and weekends. Mr. Albertini also brought home Summit materials to assist him in completing such work. Consequently, at the time he was terminated, Mr. Albertini had in his home office Summit documents and other materials, some of which were confidential. Additionally, when Summit terminated Mr. Albertini's employment, he asked a Summit employee to download on a compact disk certain files from his work computer and took that compact disk along with other files from his office. Some of the materials taken by Mr. Albertini when his employment was terminated were confidential Summit documents.

Mr. Albertini was terminated on March 22, 2002. On April 3, 2002, Summit's counsel wrote Mr. Albertini requesting that he return all property belonging to Summit by April 10, 2002. Mr. Albertini was asked to return Summit's property to Summit's counsel. *Pl's Ex. 34.* By letter dated April 8, 2002, Mr. Albertini's counsel acknowledged that Mr. Albertini had left Summit with a crate of tangible personal property which he had brought with him at the time he commenced employment with Summit. Mr. Albertini's counsel suggested that the parties meet to determine whether or not any of the property taken by Mr. Albertini was proprietary information that should be returned to Summit. *Pl's Ex. 35.* By letter dated April 11, 2002, Summit's counsel rejected Mr. Albertini's counsel's suggestion of a meeting and made demand for return of all Summit documents. *Pl's Ex. 37.* On April 18, 2002, Mr. Albertini's counsel e-mailed Summit's counsel, offering to return all

materials in Mr. Albertini's possession that the company claimed should be returned. *Pl's Ex. 38.* The parties have stipulated that "on or about May 7 and through counsel, Mr. Albertini returned the following items which were in his possession; one compact disk, a hard cover book entitled 'Spin Selling', a loose leaf binder with 2002 staff survey results and miscellaneous files". *Jt. Mem.*, at p. 4.

I find that in response to Summit's request, Mr. Albertini promptly returned to Summit all documents and other materials which he had in his possession. Therefore, I find that Mr. Albertini did not breach Article 5 of his Employment Agreement. Consequently, Mr. Albertini is not barred from recovering any payment which might be due him under the Letter Agreement.[5] I will now address whether Mr. Albertini is entitled to any such payment.

### Mr. Albertini's Claim For Termination Pay

Mr. Albertini takes the position that the term "restructuring" as used in the Letter Agreement includes any change in Summit's management structure and since he was terminated in connection with such a change, he is entitled to a termination payment as provided in the Letter Agreement. Summit, on the other hand, asserts that Mr. Albertini is entitled to a termination payment under the Letter Agreement only if there has be a change in the structure of Summit's ownership through a merger or other means of change in control of the company.

### Standard of Review

Under Massachusetts law, interpretation of a contract is a matter of

---

[him] for the costs of commuting or costs of living." *Letter Agreement.*

5. Since I have found that Mr. Albertini did not breach Article 5 of the Employment

Agreement, it is not necessary for me to address his argument that forfeiture provisions such as Article 5 are not enforceable under Massachusetts law.

law for the court, which must determine the meaning of the terms thereof. *See Coll v. PB Diagnostic Sys., Inc.,* 50 F.3d 1115, 1122 (1st Cir.1995). In doing so, the Court is required to " 'construe the contract with reference to the situation of the parties when they made it and to the objects sought to be accomplished' ". *Starr v. Fordham,* 420 Mass. 178, 190, 648 N.E.2d 1261, 1269 (1995). Oftentimes, when drafting a contract, the parties, either by intent or inadvertence, utilize terms which fail to make clear their rights, duties and obligations thereunder. The initial question of whether the wording of a contract is "in some material respect, uncertain or equivocal in meaning", in other words, ambiguous, is a question of law for the court. *NASCO, Inc. v. Public Storage, Inc.,* 29 F.3d 28, 32 (1st Cir.1994).

> Under Massachusetts law, a contract term is ambiguous when its language is 'reasonably prone to different interpretations' or 'susceptible to differing, but nonetheless plausible, constructions'. . . .
>
> . . . When contractual language is ambiguous, its meaning is a question of fact. The resolution of the ambiguity turns on the parties' intent, as 'discerned by the factfinder from the circumstances surrounding the ambiguity and from such reasonable inferences as may be available'. Extrinsic evidence is admissible to assist the factfinder in resolving the ambiguity, including evidence of, in descending order of importance: (1) the parties' negotiations concerning the contract at issue; (2) their course of performance; and (3) trade usage in the relevant industry.

*Lanier Prof. Services Inc. v. Ricci,* 192 F.3d 1, 4 (1999) (internal citations omitted). Also relevant would be the parties' prior course of dealing. *Id.,* at 4 n. 3. Furthermore, as Mr. Albertini points out, the general rule in Massachusetts is that any doubt concerning the interpretation of a contract term should be construed against the drafter of the contract. *Affiliated FM Ins. Co. v. Constitution Reinsurance Co.,* 416 Mass. 839, 844–45, 626 N.E.2d 878, 881 (1994). However, this general rule "must give way to the primary objective that a contract is to be construed to reflect the intention of the parties". *Id.,* at 845, 626 N.E.2d at 881. With these legal tenets in mind, I will now address Mr. Albertini's claim that as a result of a "restructuring" by Summit, he is entitled to a termination payment under the Letter Agreement.

### Further Findings of Fact Relative to the Parties' Intent

For twenty-two years, Mr. Albertini had worked for Simplex Time Recorder, Inc. ("Simplex"), a privately held corporation with its principal place of business in Gardner, Massachusetts. Sometime towards the end of the calendar year of 2000, Simplex's stockholders decided to sell their company to Tyco, Inc. ("*Tyco* ") From late December 2000 through January 2001, Mr. Albertini was concerned as to whether he would be employed by Simplex after its purchase by Tyco.

In late 2000 and early 2001, Summit underwent a reorganization of its corporate management during which it created the new positions of COO and three division managers. The only difference in corporate structure after this reorganization was that members of the Board of Directors relinquished their responsibility for day-to-day operations and created four new officers who would be responsible for assuming those responsibilities. The members of the Board of Directors and corporate shareholders remained the same and the owners of Summit retained not only control, but ultimate authority in running the corporation. I find that this reorganization in 2000–2001 of Summit's corpo-

rate officers was a "restructuring" of the corporation's management. Mr. Albertini was contacted by Summit to fill one of the new positions created as the result of this "restructuring".

When Mr. Casey, an officer, director and shareholder of Summit, first contacted Mr. Albertini concerning potential employment with Summit, Mr. Albertini was concerned that this potential employment would be with a privately held corporation, as was the case with Simplex. Worried about job security during the course of negotiations with Summit, Mr. Albertini suggested that Summit agree to an exit or termination payment in the event that there was a sale, restructuring, or disposition of Summit during his employment. The principals of Summit were initially reluctant to provide for such a payment, but eventually agreed to such a payment if Mr. Albertini's employment was terminated "without cause after the sale or restructuring of Summit by the current partners." *Letter Agreement.* Summit drafted the Letter Agreement, including the disputed provision.

After Mr. Albertini was terminated, Mr. Barry assumed Mr. Albertini's responsibilities. Furthermore, Mr. Casey assumed the responsibilities of another division manager who was terminated at or about the same time as Mr. Albertini. The other two division managers were retained by Summit.

### Discussion

Both parties contend that the term "restructuring" as used in the Letter Agreement is ambiguous. I agree. The question now becomes what was meant by the term "restructuring" as used by the parties in the context of Mr. Albertini's termination by Summit. Neither party has presented any evidence of the usage of the term "restructuring" within the relevant industry, nor was there any evidence concerning the parties' course of performance. Since the Letter Agreement was signed by the parties during their initial dealing with each other, extrinsic evidence of the parties' prior dealings, a factor which otherwise would be relevant to determine the parties' intent, is not available in this case. *See Ricci,* 192 F.3d at 4 n. 3. Therefore, this Court must focus on the parties' negotiations in order to determine their intent in including the disputed term "restructuring" in the Letter Agreement.

When Mr. Albertini was negotiating with Summit, his then employer, Simplex, had recently been taken over by Tyco and Mr. Albertini was unsure whether he was going to be retained by the new company. Mr. Albertini's primary concern, which he expressed to Summit executives, was that Summit would similarly be sold or otherwise taken over by another company and his position would be eliminated. For this reason, he requested that Summit agree to provide him with termination pay upon the happening of such an event. While it is true that Summit drafted the disputed language, it is clear to me that at the time that the Letter Agreement was signed, both parties intended that Mr. Albertini receive a termination payment only upon the sale of Summit, or otherwise in connection with a change of ownership of Summit, such as a merger. The meaning attributed to the term "restructuring" must reflect the context of the parties' negotiations. Based on the evidence before me, I find that the term "restructuring" as used in the Letter Agreement refers to a change in control or ownership of Summit. It is undisputed that there was no change in Summit's ownership at the time of Mr. Albertini's termination. Therefore, there was no "restructuring" within the meaning of the Letter Agreement.

Even if I were to find that the term "restructuring" was intended to include a change in the corporate management structure, no such restructuring occurred in this case. On the contrary, as a result of Summit suffering a financial setback, there was a change in personnel in two of the four new positions previously created by Summit. Specifically, Summit terminated Mr. Albertini and another employee and Mr. Barry, as President, assumed Mr. Albertini's responsibilities and Mr. Casey assumed the responsibilities of the other terminated employee. Mr. Albertini's agreements with Summit (the Letter Agreement and Employment Agreement) anticipated that the company had the right to terminate Mr. Albertini without cause. Obviously, if Mr. Albertini were terminated without cause, his position would have to be filled by someone and the fact that his position was filled by Mr. Barry, who was President of the corporation, rather than some outside individual, would not and did not amount to a restructuring of the corporation.

Under these circumstances, it is clear that neither party intended that term "restructuring" would include a mere change of personnel. Therefore, I find and conclude that Mr. Albertini is not entitled to termination pay for being terminated without cause because there was no sale or restructuring of Summit at the time of his termination.[6]

### Conclusion

Defendant's Motion To Amend The Answer (Docket No. 25) is *allowed* and the Clerk shall docket Defendant's First Amended Answer attached thereto.

6. In his Complaint, Mr. Albertini alleged a claim against Summit for violation of the implied covenant of good faith and fair dealing. I find that Mr. Albertini has waived this claim

Judgment shall enter for Summit Technical Services, Inc. on Counts One and Two of Gerald Albertini's Complaint.

by not pursuing it at trial or in any of his trial submissions filed with this Court. Furthermore, on the record before me, there is not a scintilla of evidence to support this claim.